**METRONET SERVICES CORPORATION; Metronet Telemanagement Corporation, Plaintiffs–Appellants,**

v.

**US WEST COMMUNICATIONS, Defendant–Appellee.**

No. 01–35406.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2002.

Filed March 31, 2003.

Amended May 21, 2003.

990

James L. Phillips, Brooks E. Harlow, Miller Nash LLP, Seattle, WA, for the plaintiffs-appellants.

Thomas L. Boeder, Julia Parsons Clarke and Brent Snyder, Perkins Coie LLP, Seattle, WA, for the defendant-appellee.

Jonathan M. Askin, Association for Local Telecommunications Services, Washington, DC, and James E. Hartley, Thomas P. Howard and Thorvald A. Nelson, Holland & Hart LLP, Denver, CO, for the amicus curiae Association for Local Telecommunications Services.

Before BROWNING, FISHER and TALLMAN, Circuit Judges.

## ORDER AMENDING OPINION AND DENYING JOINT PETITION FOR PANEL REHEARING AND PETITION FOR REHEARING EN BANC AND AMENDED OPINION

### ORDER

The panel has voted to deny appellees' joint petition for panel rehearing and petition for rehearing en banc, filed April 21, 2003.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The opinion filed March 31, 2003, is amended as follows:

At slip op. 4495, line 9, replace the sentence beginning "It is undisputed" with the following:

> It is undisputed that per location pricing has no cost-based justification, *compare Oahu Gas*, 838 F.2d at 368 (economic necessity justified allegedly exclusionary

conduct), and Qwest has not suggested how per location pricing enhances efficiency or improves the products offered to consumers, *see Microsoft*, 253 F.3d at 59.

At slip op. 4503, line 3, italicize "any."

At slip op. 4503, line 5, replace the phrase "but the second is erroneous." with "; the second overstates MetroNet's burden."

At slip op. 4503, line 8, insert the phrase "due to per location pricing" between the words "profitability" and "was".

At slip op. 4503, line 13, replace the sentence beginning "As to the second requirement" and the accompanying citation with the following:

> As to the second requirement, MetroNet need not prove that all of its financial woes were caused by per location pricing; rather, it must show that the financial harm attributable to per location pricing—apart from the financial harm due to other causes—was alone sufficient to drive it out of the market. *See Alaska Airlines*, 948 F.2d at 545–46.

At slip op. 4503, line 18, insert the phrase "and other resellers" after "driving it".

At slip op. 4503, line 32, add the following sentence after "this evidence of the injury to MetroNet is weak.": "So too is the evidence of injury to other resellers."

At slip op. 4504, line 1, replace the phrase "has had the effect of driving MetroNet away" with "alone had a sufficiently adverse financial impact to drive MetroNet and other resellers away." Also, add the following:

> *Id.* at 546 ("When a firm's power to exclude rivals from a facility gives the firm the power to *eliminate* competition in a market downstream from the facility, and the firm excludes at least some competitors ... a finding of monopolization, or at least attempted monopolization, is appropriate ..." (emphasis in

original)). Qwest came forward with some evidence of other reasons for MetroNet's unprofitability, but this evidence is insufficient to resolve the issue in Qwest's favor on summary judgment. The panel having adopted these amendments, appellees' joint petition for panel rehearing and petition for rehearing en banc, filed April 21, 2003, is DENIED.

## OPINION

FISHER, Circuit Judge.

This antitrust case involves the market for small business local telephone services in the Seattle/Tacoma area. Defendant–Appellee Qwest, formerly known as "U S West," owns the local telephone network in 14 western states, including Washington. In addition to selling basic flat-rate business lines, Qwest also sells "Centrex," a product offering volume discounted phone line access and calling features (e.g., voice mail and call forwarding) to businesses with more than 20 phone lines. Plaintiffs–Appellants MetroNet Services Corp. and MetroNet Telemanagement Corp. ("MetroNet") purchase Centrex from Qwest and resell it to small businesses in the Puget Sound region with 20 or fewer phone lines. By aggregating the phone lines of these small businesses, MetroNet is able to meet the Centrex 21–line minimum and pass on Centrex volume discounts to MetroNet's customers. In 1997, Qwest changed the pricing structure of the features component of Centrex in order to eliminate resale of both the access and features components. By requiring that each *location* receiving discounted Centrex features have at least 21 lines, Qwest's new pricing scheme rendered MetroNet's customers ineligible for the volume discount on features. MetroNet claims that

Qwest's imposition of "per location pricing" violated Section 2 of the Sherman Act by illegally maintaining a monopoly over the market for small business local telephone services in Seattle/Tacoma, and by denying MetroNet access to an essential facility. MetroNet appeals the district court's grant of summary judgment in favor of Qwest, arguing that the district court ignored conflicting evidence, improperly weighed evidence and failed to view the facts in the light most favorable to the nonmoving party, MetroNet.[1] MetroNet also appeals the district court's denial of its motion to enforce a written but unsigned settlement agreement with Qwest.

We hold that at this stage in the proceedings, the district court's grant of summary judgment was in error. Although it is indeed a close question, we hold, viewing the record in the light most favorable to MetroNet, that MetroNet has created triable issues of fact sufficient to proceed on its antitrust claims. We affirm the district court's denial of MetroNet's motion to enforce its settlement agreement with Qwest.

## FACTUAL AND PROCEDURAL HISTORY

Qwest sells two types of business phone services relevant to this antitrust suit: flat-rate local exchange lines called "1FB lines,"[2] and "Centrex." Centrex consists of two components: multiple telephone line access that allows a company's employees to make internal calls using a four-digit extension and external calls via the Qwest central office switch (the access component), and calling features such as call forwarding, call waiting and call hold (the features component).[3] The access compo-

---

[1] MetroNet has not challenged on appeal the district court's grant of summary judgment on its claim of attempted monopolization under Section 2 of the Sherman Act.

[2] "F" stands for "flat-rate" and "B" stands for "business." Flat-rate residential service is known as "1FR."

[3] MetroNet stresses that the access component itself consists of two subcomponents:

nent of Centrex is regulated by the Washington Utilities and Transportation Commission ("WUTC"), while the features component is not.[4] Although each component is priced separately, Qwest sells them as one bundled product, requiring customers who buy one component to buy the other as well.

Qwest originally developed Centrex for the large business market as an alternative to the private branch exchange ("PBX"), a switch owned by large businesses and located on their property.[5] Centrex obviated the need for such a switch and provided significant volume discounts to businesses with more than 20 phone lines. Small businesses with 20 or fewer lines could not take advantage of Centrex volume discounts; instead, they could purchase Centrex without the discount, or purchase 1FB lines from Qwest and features for an additional fee.[6]

As early as 1985, MetroNet and other resellers began purchasing volume discounted Centrex lines from Qwest and reselling them to aggregations of small businesses, each with 20 lines or fewer. The resellers thereby allowed small businesses to take advantage of the volume discounts previously available only to large businesses. MetroNet reaped profits by reselling Centrex at a price above what it cost MetroNet to purchase Centrex from

Qwest but below what MetroNet's customers would have had to pay for 1FB lines plus features.

### "Per location pricing"

By 1991, Qwest had taken note of the significant resale market for Centrex created by the differential pricing of Centrex and 1FB lines.[7] Qwest sought to introduce a new version of Centrex, Centrex Plus, with a pricing structure designed to "eliminate or reduce" the "arbitrage" between Centrex and 1FB lines. Under the old Centrex product, Qwest charged Centrex customers, including resellers like MetroNet, based on the number of phone lines included in the Centrex package, regardless of whether those lines ran to a single location or multiple, separate locations. This policy of "system pricing" allowed resellers to obtain the volume discounts of a single large business by aggregating the telephone lines of several variously located small businesses. With the introduction of Centrex Plus, however, Qwest intended to shift from system pricing to "per location pricing," requiring customers to have more than 20 lines *at each location* in order to receive a volume discount for the service to that location. Because the resellers' customers have 20 or fewer lines, Qwest's shift to per location pricing

---

the physical line between the customer and Qwest's switch, called the network access channel ("NAC"), and a device that limits the number of lines that have access, called the network access register ("NAR"). Because our analysis does not depend on this further level of detail, we do not refer to it in the text.

4. The WUTC deregulated the features component in 1987. *See Wash. Utils. & Transp. Comm'n v. Pac. Northwest Bell Tel. Co.,* 83 P.U.R.4th 380, 1987 WL 257925 (Wash.U.T.C. Apr.07, 1987).

5. A PBX allows four-digit internal calling and can provide some features. External dialing

is done through Qwest's local network using a "trunk line" that connects the customer's PBX to the Qwest network.

6. It is unclear from the record whether small business customers choosing to purchase 1FB lines could also buy features from providers other than Qwest.

7. The pricing differential between Centrex and 1FB lines had become so great that a significant number of small business customers were purchasing Centrex from resellers rather than 1FB lines from Qwest.

would eliminate the resellers' ability to pass on the Centrex volume discount.

Qwest had to seek WUTC approval for the new pricing structure because per location pricing was to apply not only to the unregulated features component of Centrex, but also to the regulated access component.[8] The WUTC conditionally approved per location pricing of Centrex Plus on November 18, 1993, and finally approved it on November 30, 1994. However, a year and a half later, on April 11, 1996, the WUTC abolished per location pricing and ordered that system pricing be reinstated. *See Wash. Utils. & Transp. Comm'n v. U S West Communications, Inc.*, 169 P.U.R. 4th 417, 1996 WL 350826 (Wash.U.T.C., Apr.11, 1996). The WUTC found that "the existing arrangements are discriminatory and in practice operate to benefit [Qwest]." *Id.*

Qwest viewed the WUTC order as "exasperating dramatically the existing revenue arbitrage situation" and appealed. The Washington Supreme Court upheld the WUTC order. *US West Communications, Inc. v. Wash. Utils. & Transp. Comm'n,* 134 Wash.2d 74, 949 P.2d 1337, 1364 (Wash.1997).

In December 1996, with system pricing back in place, Qwest concluded that:

> The current Washington tariff structure for Centrex Plus, [1FB], and features offers a profitable, relatively low risk opportunity for Centrex resellers to win significant market share of 1FB customers (mainly small business) in Washington. In essence, it appears that resellers can operate with positive margins while reselling [Centrex] at anywhere

from 10 to 35 percent discounts to [1FB lines], not including features.

Qwest estimated that it was losing more than $300,000 in revenues per month to MetroNet and other resellers, and that the revenue loss was having a "significantly negative" impact on profitability. In addition to these financial concerns, Qwest was greatly troubled that the loss of its direct relationship with customers due to resale would deprive it of the opportunity to cross-sell additional products and services. Qwest concluded that "no existing or forthcoming product ... effectively addresses Centrex resale competition," and set about developing strategies to win back market share.

On April 18, 1997, Qwest filed a "price list" with the WUTC reinstating per location pricing for the deregulated features component of Centrex. This later imposition of per location pricing is the subject of the present suit. As a result, the small business customers of resellers such as MetroNet had to pay dramatically higher prices for Centrex features.[9]

MetroNet's chief executive officer, Kenneth Seeley, estimated that the cost of Centrex features increased 400 percent for his customers. MetroNet expert Dr. Nina Cornell reported that resale customers had to pay nearly six times more for Centrex features than did medium-sized businesses (who presumably qualified for the per location volume discount). According to MetroNet, per location pricing also caused a slow but sure decline in MetroNet's profitability. It is unclear from the record whether this decline in profitability actually resulted in a net loss in 1999 and 2000. MetroNet's CEO Seeley claimed that MetroNet lost money in 1999 and 2000. However, MetroNet's bookkeeper testified that MetroNet was profitable in 1999.[10] The

---

8. To be more precise, the per location pricing scheme applied to the NAC subcomponent of Centrex access, not the NAR subcomponent. *See* note 3 *supra.*

9. We infer from the record that MetroNet passed the increased cost of Centrex features on to its customers.

10. In its reply brief, MetroNet misconstrues the bookkeeper's testimony. The bookkeeper

bookkeeper did not address overall profitability in 2000, but testified that for the first nine months of that year, MetroNet's revenues from the resale of Centrex exceeded MetroNet's cost of purchasing Centrex from Qwest.

Qwest contends that the number of Centrex telephone lines resold by MetroNet continued to grow for a year after the adoption of per location pricing, and that this fact demonstrates that MetroNet did not suffer any harm from per location pricing. Qwest also contends that any decline in MetroNet's profitability was due not to per location pricing, but rather to the entry of new competitors after passage of the Telecommunications Act of 1996, the precipitous drop in 1FB rates imposed by the WUTC in 1998, the advent of competing modes of access such as T–1[11] and DSL[12] and heavy personnel turnover at MetroNet. Qwest also contends that regulation by the WUTC and the requirements of the Telecommunications Act of 1996 prevent it from controlling prices and excluding resellers such as MetroNet.

### The Telecommunications Act of 1996

The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), *codified at* 47 U.S.C. § 151 *et seq.* ("1996 Act"), mandates a fundamental restructuring of the local telephone markets in all 50 states, including Washington. *See AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Prior to passage of the 1996 Act, local exchange carriers ("LECs") like Qwest held exclusive state-granted franchises in their respective local telephone markets. *Id.* Thus, Qwest had a 100 percent share in the market for local telephone services in its 14–state region, including Washington. The 1996 Act formally abolished these exclusive franchises by prohibiting states from enforcing laws that impede competition and by imposing a host of duties on *incumbent* local exchange carriers ("ILECs") such as Qwest. 47 U.S.C. §§ 251, 253.

Most importantly, the 1996 Act imposed a duty on ILECs to share their networks with new local telephone providers, known as competitive local exchange carriers ("CLECs"). *Id.* § 251(c). "Under this provision, a requesting [CLEC] can obtain access to an [ILEC's] network in three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the [ILEC's] network 'on an unbundled basis'; and it can interconnect its own facilities

---

testified that in 1999 MetroNet experienced billing differences of $503,426 between what it paid Qwest for Centrex and what it earned from resale. MetroNet claims that the $503,426 was a net loss to MetroNet. In other words, MetroNet claims that it paid $503,426 more to Qwest for Centrex than it earned through resale. It is clear from the transcript of the bookkeeper's deposition, however, that the $503,426 billing difference was a surplus, not a net loss. In 1999, MetroNet resold Centrex for $503,426 more than it paid Qwest. The bookkeeper's testimony is unambiguous, and thus there is a direct conflict between his testimony and that of MetroNet CEO Seeley.

**11.** T–1 line is a dedicated phone connection supporting high speed data transmission.

Each line "actually consists of 24 individual channels, each of which supports 64Kbits per second. Each 64Kbit/second channel can be configured to carry voice or data traffic. Most telephone companies allow you to buy just some of these individual channels, known as *fractional T–1* access. T–1 lines are a popular leased line option for businesses connecting to the Internet...." Webopedia, *T–1 carrier, at* http://www.webopedia.com /TERM/ T/T—1—carrier.html.

**12.** "DSL" stands for "digital subscriber lines." DSL technology allows data to be transmitted over existing copper telephone lines at very high speeds, and thereby greatly facilitates use of the Internet. Webopedia, *xDSL, at* http://www.webopedia.com /TERM/ x/xDSL.html.

with the [ILEC's] network." *AT&T Corp.,* 525 U.S. at 371, 119 S.Ct. 721; 47 U.S.C. § 251(c)(2–4). Both interconnection and unbundled access must be provided "at any technically feasible point" in the carrier's network, and on "rates, terms and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2–3). ILECs may not impose unreasonable conditions or limitations on the resale of telecommunications services to CLECs. *Id.* § 251(c)(4).[13]

When a CLEC seeks access to an ILEC's network through any of the three routes described above, the incumbent can negotiate an agreement without regard to the duties imposed by § 251. *Id.* § 252(a)(1); *see also AT&T Corp.,* 525 U.S. at 372–73, 119 S.Ct. 721. However, if negotiations break down, either party may petition the relevant state commission—in this case the WUTC—to arbitrate the dispute, and the state commission must ensure that any resolution meets the requirements of § 251 and its implementing regulations. *See* 47 U.S.C. § 252(b)(1) & (c); *see also AT&T Corp.,* 525 U.S. at 373, 119 S.Ct. 721. The 1996 Act charged the Federal Communications Commission ("FCC") with issuing implementing regulations, but left the determination of rates in the hands of state commissions such as the WUTC, subject to the broad pricing standards set forth in the 1996 Act. *See* 47 U.S.C. §§ 251(d), 252(d).

### New Entrants

The parties do not dispute the terms of the 1996 Act—only its practical effect on the market for small business local phone services in Seattle/Tacoma. It is undisputed that since passage of the 1996 Act, Qwest's market share has declined by 4.2 percent, from 100 to 95.8 percent. Relying solely on MetroNet's draft marketing plan for 2000, Qwest argues that the 1996 Act has ushered in an era of significant and effective competition. The draft report, prepared by sales manager Robert Beckett and quality assurance manager Brian Tatman, stated that "MetroNet ... has seen the number of competitive providers go from solely U S West to over 17 in the past three years.... The flood of competition has produced a never ending push for customers to switch services to a new provider." "MetroNet has lost an average of 220 lines per month, with a total loss of 5721 since January 1998." According to the draft report, 86 percent of the losses went to Qwest affiliates, 14 percent to CLECs.

MetroNet disputes the validity of the statements made in the report. MetroNet cites Tatman's deposition testimony that the draft marketing plan was hastily prepared, based on few hard facts, and never finalized. MetroNet also cites the testimony of Gregory Bogus, its chief operating officer, who stated that the increase in competition after passage of the 1996 Act was confined mainly to the large business telephone market—not the small business market in which MetroNet competes—and that the effect on MetroNet was marginal.

MetroNet contends that the requirements set forth in the 1996 Act and its implementing regulations have not yet become a reality in the state of Washington. MetroNet points out that the 4.2 percent market share of Qwest's competitors is hardly evidence of robust competition. No single competitor has more than one percent of the market for small business local telephone services. In addition, Metro-

---

**13.** However, "a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a tele-communications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers." *Id.* § 251(c)(4)(B).

Net's experts claim that various circumstances have kept the central provisions of the 1996 Act from coming to fruition. MetroNet expert Cornell claims that litigation over implementation of the 1996 Act has created a significant ongoing barrier to the realization and use of the rights granted by the act. According to MetroNet expert Kenneth Wilson, Qwest has refused to open its network to local competition on rates, terms and conditions that are just and reasonable, and has refused to provide interconnection at any technically feasible point. He further claims that Qwest has imposed limitations on the use and combination of unbundled elements. According to Wilson, the resale of Centrex is the only area in the market where Qwest faces significant competition.[14] Wilson further claims that due to Qwest's continued control of the small business local telephone services market, there is no practical alternative to purchasing 1FB or Centrex lines from Qwest, or Centrex lines from resellers like MetroNet.

### New Products

Qwest disputes Wilson's claim by arguing that small business customers could also obtain local telephone service by purchasing T–1 lines or DSL lines instead of Centrex or 1FBs. Qwest argues that MetroNet lost customers because it did not offer these and other services. According to MetroNet's marketing manager and former sales manager, MetroNet was losing customers to competitors at least in part because it was not offering products such as DSL lines and T–1 lines. However, MetroNet claims that facility-based CLECs offering these products only serve high-density metropolitan areas and focus on large, not small, business customers.

Qwest also argues that MetroNet lost customers due to the introduction of Centrex 21 in 1997. Centrex 21 was targeted at "small to medium business customers" and was designed "to fill the product continuum gap that currently exists between Basic 1FB service and Centrex Plus." Centrex 21 bundled analog or digital line access with calling features such as call waiting, caller ID and call forwarding. Instead of the Centrex Plus minimum of 21 lines per location, Centrex 21 had a 3 lines per location minimum, up to 50 lines total. Thus, Centrex 21 offered small business customers direct discounts on what was essentially a non-per location basis.

### Regulation by the WUTC

As a provider of telecommunications services in the state of Washington, Qwest is subject to regulation by the WUTC. The WUTC is authorized to regulate in the public interest the rates, services, facilities and practices of Qwest and other telecommunications companies. Wash. Rev.Code § 80.01.040(3). Qwest's rates must be "fair, just, reasonable and sufficient," and its service must be "rendered and performed in a prompt, expeditious and efficient manner." *Id.* § 80.36.080.

Qwest must file its tariff schedules with the WUTC, and is prohibited from changing a tariff unless it gives 30 days notice to the WUTC and the public. The WUTC can suspend the proposed changes within the 30 day period, or at any time before they are due to go into effect. *Id.* § 80.36.110(1). Qwest may file a tariff that decreases any rate with 10 days notice without receiving a special order from the WUTC, if the filing does not contain a compensating increase in any rate and if the company agrees for a period of one

---

**14.** As late as October 2000, resellers continued to sell over 60,000 Centrex lines to small business customers. This constituted 31 per-

cent of the total Centrex market (i.e. all Centrex lines sold to small, medium and large size businesses).

year not to seek an increase in any rate to recover for revenue lost as a result of the decrease. *Id.* § 80.36.110(2).

The WUTC may on its own initiative or upon complaint hold a hearing to determine whether the rates being charged are "unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law," or "are insufficient to yield reasonable compensation for the service rendered." *Id.* §§ 34.05.413, 80.36.140. If the WUTC finds in the affirmative, it may impose just and reasonable rates. *Id.* § 80.36.140.

The WUTC has the power to classify a telecommunications company's services as competitive if the service is subject to effective competition. The prices for competitive services must cover their costs. The WUTC does not have the power to investigate prices for competitive services on its own motion, but it may investigate them upon complaint. *Id.* § 80.36.330(4). Changes in the price of competitive services can become effective 10 days after the list is submitted to the WUTC. *Id.* § 80.36.330(2).

The prices Qwest charges for 1FB lines and for the access component of Centrex are regulated by the WUTC. The price of the features component of Centrex, however, is not, because the WUTC has deemed features a competitive service. MetroNet contends that Qwest exercises effective control over the price for Centrex access despite WUTC regulation, and that Qwest has the ability to exclude competitors such as MetroNet. MetroNet's expert Cornell claims that Qwest effectively has wide latitude in pricing the access component of Centrex because of the WUTC's limited statutory authority, its limited resources and the constraints of the regulatory process. She contends that the WUTC's inability to suspend a proposed price decrease unless that decrease is also accompanied by an offsetting price increase means that

Qwest can decrease the price of Centrex access at will. In addition, Qwest can effectively raise the price of access by raising the price of the bundled but unregulated features component.

## The Drop in 1FB Rates

Prior to February 1998, the regulated price of a 1FB line was much greater than the regulated price of a volume discounted Centrex line. It is this disparity in rates that created the business opportunity for resellers like MetroNet. However, in February 1998, the WUTC ordered Qwest to reduce its rates for 1FB lines by more than 31 percent (from $38.10 to $28.60). Shortly thereafter, Qwest also lowered the rate for Centrex access. MetroNet's Marketing Plan 2000 described these rate reductions as the "greatest blow" suffered by MetroNet. According to MetroNet sales manager Beckett, the drop in 1FB rates was a much more significant blow to MetroNet's business than was the entry of competitors. After the sharp reduction in 1FB rates, the number of Centrex lines resold by MetroNet began to decline and the entire sales department resigned.

## The Settlement Agreement

Because MetroNet appeals the district court's denial of MetroNet's motion to enforce its purported settlement agreement with Qwest, we set out the facts relevant to the ruling on MetroNet's motion. About nine months after MetroNet filed its antitrust case against Qwest, the two parties met to settle the case. The settlement meetings took place on September 26 and October 3, 2000. Qwest was represented by Lisa Anderl, its in-house counsel, and Don Taylor, the senior account manager responsible for the MetroNet account. MetroNet was represented by its Chief Operating Officer Greg Bogus and by outside counsel Brooks Harlow. After a day and a half of negotiations, the parties were

still far apart on the amount of the proposed settlement.

Anderl and Harlow met separately on the afternoon of October 3 and agreed to seek approval from their respective principals for a settlement in the amount of $2.55 million. Harlow called Anderl later that day stating that he had authority from MetroNet to settle for that amount. Anderl informed him on October 3 or 4 that she also had authority to settle for $2.55 million. Over the next two days, Anderl and Harlow exchanged several drafts of the proposed settlement agreement. Harlow claims that he and Anderl agreed on the final wording of the agreement late on October 5th, and that Anderl told him she had received the necessary approvals from various vice presidents at Qwest. According to Harlow, he and Anderl represented to each other that they had all necessary authority and would be able to obtain signatures on Friday morning, October 6th.

When Harlow called Anderl on Friday morning, however, Anderl informed him she was uncertain she could get the necessary signatures from Qwest. Anderl reiterated this uncertainty on October 9th, and on October 10th she informed Harlow that Qwest's general counsel had decided not to settle the case.

Harlow claims that in his prior negotiations with Anderl over other litigation matters and business agreements, Anderl had either acted on her own authority or had made a deal after speaking with an officer of U S West. Qwest claims that following its merger with U S West on June 30, 2000, it implemented a new policy for Qwest and its subsidiaries designating certain officers as the sole authorized signatories able to bind the company or a subsidiary. According to Qwest General Counsel Tempest, "[a]t no time did any of the designated signatories authorized to bind the Qwest Corporation approve the purported settlement agreement [between Qwest and MetroNet]."

Procedural History

MetroNet filed suit against Qwest on January 5, 2000, seeking money damages and injunctive relief for alleged violations of Section 2 of the Sherman Act.[15] MetroNet asserted three causes of action under Section 2. First, MetroNet claimed Qwest maintained a monopoly over the market for small business local phone services in the Seattle/Tacoma area. Second, MetroNet claimed Qwest attempted to monopolize that market. Third, MetroNet claimed Qwest denied MetroNet access to an essential facility.

On September 26 and October 3, 2000, MetroNet and Qwest met to attempt to settle the case. Qwest withdrew from the proposed settlement agreement on October 10, 2000, and two days later MetroNet moved for an order enforcing the settlement agreement. The district court denied the motion on October 20, 2000, and denied MetroNet's motion to reconsider on November 13, 2000.

Qwest moved for summary judgment on February 13, 2001, and the district court granted Qwest's motion in its entirety on April 16, 2001. MetroNet now appeals the grant of summary judgment and the denial of its motion to enforce the settlement agreement.[16]

---

**15.** MetroNet also asserted a state law cause of action for breach of contract and the implied covenant of good faith and fair dealing. This cause of action was dismissed without prejudice by the district court on May 2, 2000.

**16.** In its opening and reply briefs on appeal, MetroNet has neither challenged, nor even mentioned, the district court's grant of summary judgment against MetroNet on its attempted monopolization claim. As a result, MetroNet has waived this issue on appeal. *See Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1168 (9th Cir.1996)

## ANALYSIS

### I. Federal Antitrust Claims

#### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there exist any genuine issues of material fact and whether the district court correctly applied the substantive law. *Id.* We may not weigh the evidence or determine the truth of the matter; rather, we may determine only whether there is a genuine issue for trial. *Id.* at 1054.

 Although we have noted a number of times in the past that "[s]ummary judgment is disfavored in antitrust cases," *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 989 (9th Cir.1993), such disfavor is limited to "complex antitrust litigation where motive and intent are important, proof is largely in the hands of the alleged conspirators, and relevant information is controlled by hostile witnesses." *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 982 (9th Cir.2001).[17] As the district court rightly concluded, this is not such a case. We therefore decline to place a thumb on the scale against granting summary judgment.

### B. Implied Immunity

 Qwest contends for the first time on appeal that the 1996 Act preempts MetroNet's antitrust claims. Ordinarily, we will not consider legal theories made for the first time on appeal. *Harden v. Roadway Package Sys., Inc.*, 249 F.3d 1137, 1141 (9th Cir.2001). Subject matter jurisdiction, however, is not waivable and therefore may be challenged at any time. *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1163–64 (9th Cir.2002). The question thus arises whether implied immunity is jurisdictional in nature or whether it is better understood as an affirmative defense subject to waiver. The parties have not briefed this issue and we need not decide it: Qwest's implied immunity argument fails regardless of whether implied immunity is jurisdictional or an affirmative defense.

The Second Circuit recently held that implied antitrust immunity is an affirmative defense subject to waiver and as such "does not affect the court's subject matter jurisdiction over the action." *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 150 (2d Cir.2003). If that view of implied immunity is correct, then Qwest has waived its implied immunity argument.

The Supreme Court, however, has suggested that implied immunity deprives a

---

(holding that issues not raised and argued in a party's opening brief are waived).

**17.** Although some of our cases, such as *High Tech. Careers*, may appear to stand for the proposition that summary judgment is disfavored in all antitrust cases, we have never expressly held that the disfavor extends beyond cases in which motive and intent are centrally in issue. Our oft repeated statement that "[s]ummary judgment is disfavored in antitrust cases" can always be traced back to the Supreme Court's statement in *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), that "sum-

mary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Id.* at 473, 82 S.Ct. 486. In *High Tech. Careers*, for example, we cited *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168 (9th Cir. 1988), for the proposition that "[s]ummary judgment is disfavored in antitrust cases." *High Tech. Careers*, 996 F.2d at 989. *Christofferson* relied on *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir.1986), *see Christofferson*, 849 F.2d at 1171, which in turn relied on *Poller. See Dimidowich*, 803 F.2d at 1477.

court of subject matter jurisdiction because it vests exclusive preliminary jurisdiction in the relevant regulatory agency. *See, e.g., United States Navigation Co. v. Cunard S.S. Co.*, 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408 (1932) (holding that the Shipping Act supersedes the antitrust laws and vests the Shipping Board with "exclusive preliminary jurisdiction"); *see also United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 734–35, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ("[W]e have implied immunity in particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts *exercising jurisdiction under the antitrust laws.*") (emphasis added). On this view, the issue of implied immunity has not been waived and is properly before us.

Even if we assume *arguendo* that Qwest's implied immunity argument has not been waived, it fails nonetheless. Qwest relies on *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir.2000), in which the court held that "[t]he 1996 Act is ... more specific legislation that must take precedence over the general antitrust laws, where the two are covering precisely the same field." *Id.* at 401.[18] Two other circuit courts have expressly disagreed with *Goldwasser,* concluding that the 1996 Act did not confer implied immunity from suit under the antitrust laws. *See Law Offices of Curtis V. Trinko v. Bell Atl. Corp.*, 305 F.3d 89, 109–13 (2d Cir.2002) (as amended), *cert. granted in part sub nom. Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,* —— U.S. ——, 123

S.Ct. 1480, 155 L.Ed.2d 224 (2003); *Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272, 1280–82 (11th Cir.2002). We agree with the Second and Eleventh Circuits that the 1996 Act did not impliedly immunize Qwest from antitrust liability.

The Supreme Court has repeatedly noted that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (internal quotation marks and citations omitted). The plain language of the statute reveals that Congress intended the 1996 Act to coexist with, rather than preempt, the antitrust laws. "Congress explicitly stated—both through a savings clause directed specifically at antitrust enforcement and through an additional general savings clause—that the 1996 Act does not supplant or change the antitrust laws." *Covad Communications Co.*, 299 F.3d at 1280. The 1996 Act provides:

ANTITRUST LAWS ... SAVINGS CLAUSE ... [N]othing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws....

FEDERAL STATE AND LOCAL LAW ... NO IMPLIED EFFECT ... This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or Amendments.

18. The *Goldwasser* court stated that "Our principal holding is ... not that the 1996 Act confers implied immunity on behavior that would otherwise violate the antitrust law. Such a conclusion would be troublesome at best given the antitrust savings clause in the statute." *Id.* at 401. However, the court *in effect* held that defendants are impliedly immune from suit under the antitrust laws when the challenged conduct is also covered by the 1996 Act. *Id.*

**1002**

Telecommunications Act of 1996, §§ 601(b)(1), (c)(1), 110 Stat. 56, 143 (1996), *codified at* 47 U.S.C. § 152, Historical and Statutory Notes. In light of this express language, we conclude that no "plain repugnancy" exists between the 1996 Act and the antitrust laws. *Law Offices of Curtis v. Trinko,* 305 F.3d at 109 ("The savings clause unambiguously establishes that there is no 'plain repugnancy' between the Telecommunications Act and the antitrust statutes [and thus ] that the Telecommunications Act does not provide an 'implicit immunity' from the antitrust laws."); *Covad Communications Co.,* 299 F.3d at 1281 (same).[19]

▮ Even absent the explicit language of the savings clauses, Qwest would not be entitled to implied immunity for its imposition of per location pricing. "Pervasive regulation of an industry alone is insufficient to confer blanket immunity on every action taken within the industry." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1056 (9th Cir.1983) (citing *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372–75, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)).[20] Although we have recognized a limited class of cases in which a regulatory mandate to engage in anticompetitive conduct may confer implied antitrust immunity, no such mandate exists here. *Id.* at 1057. The 1997 switch from system pricing to per location pricing for Centrex features was freely undertaken by Qwest in an effort to eliminate re-

sale. Where the conduct challenged under the antitrust laws "is the product of the regulated business' independent initiative and choice, [that conduct] is properly subject to antitrust scrutiny." *Id.* Thus, Qwest's imposition of per location pricing is not conduct entitled to implied immunity.

## C. Discussion

MetroNet contends that the district court overlooked genuine disputes of material fact in ruling that Qwest neither maintained a monopoly nor excluded MetroNet from an essential facility in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. We consider each claim in turn.

### 1. The Monopolization Claim

▮ Section 2 of the Sherman Act makes it illegal for a person to "monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2. Any person "injured in his business or property" by such monopolization may bring suit for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15(a). In order to prevail on its monopolization claim, MetroNet must prove that Qwest (1) possessed monopoly power in the relevant market, (2) wilfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury. *See Am. Prof'l Testing Serv., Inc.*

**19.** Like the Eleventh Circuit, we conclude "that the plain statutory language is sufficient to end our inquiry on this matter." *Covad Communications Co.,* 299 F.3d at 1281. We also agree with the Eleventh Circuit that "should there be any doubt that the plain language of the savings clause resolves the issue, we find support for our conclusion in the legislative history surrounding the 1996 Act, reflecting that the President, the Congress, the Department of Justice, and the FCC have emphasized the critical need for the antitrust laws to work in conjunction with the

1996 Act in order to spur competition in the telecommunications industry." *Id.*

**20.** "A regulatory mandate sufficient to confer implied antitrust immunity may in some cases exist where there is explicit congressional approval of the challenged conduct and its ultimate anticompetitive effect, and there is no inconsistency or 'plain repugnancy' between the conduct and the express policies of the regulating body." *Northrop,* 705 F.2d at 1057.

*v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,* 108 F.3d 1147, 1151 (9th Cir.1997). The district court erroneously concluded on summary judgment that MetroNet could not establish any of these elements.

■■■ *Monopoly power:* Monopoly power, commonly referred to as market power, is defined as " 'the power to control prices or exclude competition.' " *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). "Market power can be proven by either direct or circumstantial evidence." *Id.* Because direct evidence of the power to control prices or exclude competitors is rarely available, courts generally rely on circumstantial evidence of market power. *United States v. Microsoft Corp.,* 253 F.3d 34, 51 (D.C.Cir.2001). In order to establish Qwest's market power by circumstantial evidence, MetroNet must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and ... that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil, Inc. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995).

Here, the relevant market is not in dispute. The parties have defined it as the market for small business local telephone services in the Seattle/Tacoma area. Thus we turn directly to the issue of Qwest's market share. The principal competing products in the market are Qwest's 1FB service and the resellers' Centrex service purchased from Qwest and resold to small business users.[21]

The district court concluded that even though Qwest's market share exceeds 95 percent, "it is highly unlikely that Qwest's high market share confers upon it monopoly power." The court reasoned that the 1996 Act had already removed many of the barriers to entry, and any remaining barriers "will diminish in time as new firms build their infrastructure, gain a toehold in the market, advertise more widely, and gain wider recognition." On these assumptions, the court predicted that "a 95 [percent] market share now could well evaporate in the coming years without antitrust involvement."

The district court was equally dismissive of MetroNet's claim that Qwest could control prices. The court reasoned first that "phone service is not the type of commodity that is susceptible to price increase through output reduction." The court also reasoned that competition in the wake of the 1996 Act would limit Qwest's ability to control prices for calling features, and that regulation by the WUTC "mitigates the extent to which Qwest can simply dictate prices for access to phone service."

■■■ The district court was correct to focus its attention on Qwest's ability to exclude competition and control prices, rather than simply on market share. In general, a plaintiff may establish a prima facie case of market power by showing that the defendant has a 65 percent or greater market share. *Image Tech.,* 125 F.3d at 1206 (citing *Am. Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). However, in cases involving regulated industries, "[r]eliance on statistical market share ... is downright folly where, as here, the predominant market share is the result of

---

**21.** The market also includes T–1 and DSL lines sold to small businesses, though the parties dispute the extent to which these products provide small businesses with viable alternatives to 1FB and Centrex lines. The market does not encompass Qwest's sales of Centrex directly to end-users because those end users are large, not small, businesses.

regulation." *Metro Mobile CTS, Inc. v. NewVector Communications, Inc.,* 892 F.2d 62, 63 (9th Cir.1989); *see also S. Pac. Communications Co. v. AT & T,* 740 F.2d 980, 1000 (D.C.Cir.1984) ("Reliance on statistical market share is a questionable approach in cases involving regulated industries.... A predominant market share may merely be the result of regulation, and regulatory control may preclude the exercise of monopoly power."). We have held that "[i]n such cases, the court should focus directly on the regulated firm's ability to control prices or exclude competition." *Metro Mobile,* 892 F.2d at 63; *see also S. Pac. Communications Co.,* 740 F.2d at 1000 (holding that "in such cases market share should be at most a point of departure in determining whether monopoly power exists. Ultimately, a court should focus directly upon the ability of the regulated firm to control prices or exclude competition.").

 Although the focus of the district court's inquiry was correct, the court nonetheless improperly weighed evidence and failed to view the facts in the light most favorable to MetroNet. The court should not have substituted its own speculations about present and future barriers to entry for the evidence in the record. MetroNet's expert Cornell stated in her declaration that there are at least three structural barriers to entry that give Qwest a high degree of market power: (1) each end user of telephone services must be physically connected to a local exchange switch, which makes it prohibitively expensive to build a telephone network from scratch; (2) because Qwest owns the only comprehensive local exchange network, both facilities-based providers and resellers need a high degree of cooperation from Qwest in order to access that network; and (3) Qwest's historical monopoly has created enormous economies of scale that discourage competition and give Qwest an incentive not to cooperate.

The district court concluded, based presumably on MetroNet's year 2000 draft marketing report, that "MetroNet's expert overstates the case for high entry barriers in this market." The draft marketing report, which was prepared by sales manager Beckett and quality assurance manager Tatman, stated that "MetroNet ... has seen the number of competitive providers go from solely U S West to over 17 in[the] past three years.... The flood of competition has produced a never ending push for customers to switch services to a new provider." However, the validity of these statements is contested. Tatman testified on deposition that the draft marketing plan was hastily prepared, based on few hard facts and never finalized. MetroNet COO Bogus testified that the increase in competition after passage of the 1996 Act was confined mainly to the large business telephone market and that the effect on MetroNet was "marginal." The district court improperly treated the statements in the draft marketing report as though they were undisputed by MetroNet.

 Qwest argues that the statements in the draft marketing report are sufficient to "render MetroNet's expert reports to the contrary unreasonable and preclude MetroNet (and Amicus) from arguing that those reports raise a factual dispute." The district court's disregard for the testimony of MetroNet's experts seems premised on the same argument. We have recognized that "expert opinion ... may defeat summary judgment if it appears that the affiant is competent to give an expert opinion and that the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not." *Rebel Oil,* 51 F.3d at 1435. However, "the inference to be drawn from expert affidavits must ... be sufficient to support a favorable jury verdict." *Id.* " 'When an expert opinion is not supported by suffi-

cient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'" *Id.* at 1436 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). Thus, in antitrust cases, inferences drawn from expert opinions must be economically reasonable in light of "undisputed facts about the structure of the market." *Id.* at 1435–36. There is no basis in the record for concluding that the testimony of MetroNet's experts fails to meet the standard articulated in *Rebel Oil.* It was improper for the district court to disregard the opinions of MetroNet's experts without providing a reasoned analysis of how their opinions failed to satisfy the *Rebel Oil* standard.

The court also erred in concluding that Qwest could not control price due to competition in the market for features and WUTC regulation of the price of Centrex access. The court inferred from MetroNet's year 2000 draft marketing report that at least 17 competitors had entered the local small business telephone services market in Seattle/Tacoma. As we point out above, however, the draft marketing report cannot be accepted as undisputed evidence. MetroNet has raised a triable issue of fact as to the number and extent of new entrants.

Even if the draft marketing report were accepted as true, "[t]he fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers." *Rebel Oil,* 51 F.3d at 1440. We have previously concluded on several occasions that monopoly power exists despite the presence of new entrants. *Id.* at 1441 (holding, on appeal from summary judgment, that a juror could reasonably conclude that the entry of two gas stations into the Las Vegas retail gasoline market would be insufficient to offset supracompetitive prices); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.,* 838 F.2d 360, 367 (9th Cir.1988) (holding, on appeal of a motion for judgment notwithstanding the verdict, that the entry of two rivals did not preclude the jury's finding of monopoly power); *Pac. Coast Agric. Exp. Assoc. v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir.1975) (holding that Sunkist had monopoly power over the Hong Kong export market for Arizona-and California-grown oranges, where its competitors "were relatively small, with no single competitor controlling over ... 12% of the market after [ ] Sunkist's entry."). In the present case, recent entrants collectively account for less than five percent of the market, and no single entrant has more than a one percent share. Qwest asks us to infer from this anemic market share that the opinions of MetroNet's experts on barriers to entry are unreasonable. We decline to do so. There is no evidence that these entrants will continue to wrest market share from Qwest.

In concluding that the WUTC could effectively constrain Qwest's ability to control the price of telephone access, the district court failed to consider the realities of Washington's regulatory scheme. *See S. Pac. Communications,* 740 F.2d at 1001 (setting aside the district court's conclusion on summary judgment that AT & T lacked monopoly power because the district court "fail[ed] to consider the realities of the regulatory scheme.... The regulatory agencies are not always able to respond to the alleged abuses immediately and effectively."). MetroNet proffered evidence that the WUTC's limited statutory authority, limited resources and the constraints of the regulatory process effectively left Qwest with considerable latitude in setting the price for Centrex access. MetroNet also proffered evidence that for the last 15 years Qwest has been able to evade the WUTC's instructions to unbundle Centrex access from Centrex features.

The key question is whether existing competitors and immediate potential entrants have sufficient capacity to take business away from the incumbent monopolist and thereby constrain the incumbent's ability to raise prices above competitive levels. *See Rebel Oil*, 51 F.3d at 1440–41; *see also Microsoft*, 253 F.3d at 51. MetroNet has proffered sufficient evidence on the continuing barriers to entry to create a triable issue of fact as to the ability of new and existing entrants to constrain Qwest's market power.

*Exclusionary conduct:* The mere existence of monopoly power does not constitute illegal monopolization under Section 2 of the Sherman Act. A plaintiff must also establish that the defendant acquired or maintained the monopoly by engaging in exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698. "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers.... [H]arm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58 (emphasis in original). This focus on an anticompetitive effect is essential, because "it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil*, 51 F.3d at 1433. Thus, courts must seek to distinguish between exclusionary conduct that harms consumer welfare and legitimate competitive acts that enhance it. *Microsoft*, 253 F.3d at 58. We have held that "[c]onsumer welfare is maximized when eco-

nomic resources are allocated to their best use .... and when consumers are assured competitive price and quality." *Rebel Oil*, 51 F.3d at 1433. "[A]n act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality." *Id.* (emphasis in original).

In assessing whether Qwest's imposition of per location pricing has harmed consumer welfare, we are mindful that the antitrust laws protect competition, not particular competitors. We do not suggest that a provider of services must maintain in existence middlemen who deliver no economic value to consumers. MetroNet's allegation, rather, is that resellers enhance consumer welfare by providing small business consumers with lower-price telecommunications services, and that Qwest is seeking to eliminate this contribution to consumer welfare through per location pricing.

The district court concluded that MetroNet could not establish harm to consumer welfare because market competition prevented Qwest from raising the overall price for Centrex above competitive levels. The court reached this conclusion based on evidence that the overall price of Centrex to consumers dropped significantly. Qwest argues similarly on appeal that the decline in the overall price of Centrex precludes a finding that Qwest raised prices above competitive levels.

We must determine whether MetroNet has created a triable issue of fact as to whether per location pricing harmed consumer welfare. Both the district court and Qwest erroneously focus on the overall price of Centrex.[22] It is undisputed that

22. That Qwest requires customers to purchase access and features together does not in turn require that we look at the bundled, rather than the unbundled, price of Centrex components in assessing harm to consumer welfare. Even if the fall in the price of access more than offset a rise in the price of features, thereby causing the overall price of Centrex to fall, Qwest could still be held liable for anti-

when Qwest instituted per location pricing the price of Centrex features for customers with fewer than 21 lines went up approximately 400 percent, and that it was almost six times greater than the price charged to medium and large businesses. This is prima facie evidence of pricing above competitive levels.

MetroNet also proferred evidence that the elimination of resellers would harm allocative efficiency. According to Cornell, resale performs the beneficial function of "forc[ing] the firm whose services are being resold to limit volume discounts to levels that are cost-based. Without resale, the firm might be able to offer volume discounts that were greater than the costs saved and recover the lost revenues from smaller users." MetroNet contends, and Qwest has not denied, that there is no cost-based or volume-based justification for per location pricing. Courts have recognized that discount resellers such as MetroNet can play an important role in creating and maintaining a competitive marketplace and have held that attempts to eliminate discounters violate the antitrust laws. *Cf. United States v. Gen. Motors Corp.*, 384 U.S. 127, 146–47, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (holding that a conspiracy among GM, automobile dealers and their association to deprive franchised dealers of the freedom to sell through discounters was unlawful conspiracy in restraint of trade under Section 1 of the Sherman Act); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935–37 (7th Cir.2000) (up-

holding an FTC decision that a conspiracy between Toys "R" Us and toy manufacturers to restrict manufacturers' sales to low price warehouse club stores violated the antitrust laws).

There would be no harm to consumer welfare if customers could switch to a virtually identical product costing the same or less than Centrex without per location pricing. Thus, if customers could purchase 1FB lines and features for approximately the same price they would pay for Centrex access and features without per location pricing, MetroNet would have no claim. But the record suggests the contrary: the price of 1FB lines *without features* remained significantly above the price of Centrex, even after the WUTC-imposed drop in the price of 1FB lines in February 1998. The record suggests that small business consumers had little or no economically equivalent alternative but to continue purchasing Centrex access and features from resellers such as MetroNet. If true, the increase in the price of Centrex features above competitive levels harmed consumers.[23]

■■■ Given that MetroNet has successfully made out a prima facie case of exclusionary conduct by demonstrating anticompetitive effect, the burden shifts to Qwest to offer a procompetitive justification for per location pricing. *See Microsoft*, 253 F.3d at 59.

If the monopolist asserts a procompetitive justification—a nonpretextual claim

---

competitive pricing on the features component. The question is whether the price of features, and therefore Centrex overall, would be *even lower* were it not for per location pricing.

Qwest asserts that its pricing of calling features does not raise antitrust concerns because the pricing of features is unregulated. The mere fact that the price of features is unregulated, however, does not negate the undisputed evidence that Qwest's imposition

of per location pricing raised the price of features far above cost for small business customers.

**23.** The lack of an effective substitute is also borne out by the fact that as late as October 2000, resellers continued to sell more than 60,000 Centrex lines to small business customers. This constituted 31 percent of the total Centrex market (i.e. all Centrex lines sold to small, medium and large businesses).

that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim.... [I]f the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.

*Id.* Qwest has not asserted any procompetitive justification for per location pricing. It is undisputed that per location pricing has no cost-based justification, *compare Oahu Gas,* 838 F.2d at 368 (economic necessity justified allegedly exclusionary conduct), and Qwest has not suggested how per location pricing enhances efficiency or improves the products offered to consumers, *see Microsoft,* 253 F.3d at 59.[24] Therefore, MetroNet has proffered sufficient evidence to establish exclusionary conduct on the part of Qwest.

*Antitrust injury:* A private party seeking damages under Section 2 must also establish that the defendant caused it antitrust injury. Based on its determination that MetroNet failed to raise a triable issue of fact as to Qwest's alleged monopoly power or exclusionary conduct, the district court summarily concluded that MetroNet could not establish that it suffered an antitrust injury. Because we have reached the opposite conclusion with respect to Qwest's alleged monopoly power and exclusionary conduct, we address the merits of the antitrust injury requirement.

■ To satisfy this requirement, the plaintiff must show (1) that it suffered an injury in fact, (2) that the injury was caused by an antitrust violation and (3) that the injury was of the type the anti-

trust laws were intended to prevent. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Rebel Oil,* 51 F.3d at 1433. Qwest contends that MetroNet has failed to establish any of these elements. We consider each of them in turn.

■ First, Qwest argues that MetroNet has failed to establish that it suffered injury in fact. MetroNet's CEO Seeley claims MetroNet began losing money in 1997 and suffered a net loss in 1999 and 2000. However, MetroNet's bookkeeper testified on deposition that MetroNet was profitable in 1999. Although the evidence of the financial harm to MetroNet is weak, it is sufficient to withstand summary judgment. Even if MetroNet remained profitable in 1999, the testimony of its CEO indicates an increasing loss of revenue and profits. A showing of harm under Section 2 of the Sherman Act does not require that the plaintiff go bankrupt or experience a net loss. A decline in anticipated profits will suffice. *See, e.g., Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1215 (9th Cir.1983) ("To establish causal antitrust injury, 'the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and *some loss of anticipated revenue.*'" (emphasis added)); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ("[The plaintiff's] burden of proving the fact of damage under [Section] 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the

---

**24.** It is also undisputed that Qwest imposed per location pricing in order to eliminate the resale market for Centrex Plus. However, we note that evidence of intent behind Qwest's

conduct is relevant only to the extent that it helps us understand the likely effect of Qwest's conduct. *Microsoft,* 253 F.3d at 59.

fact of damage." (emphasis in original)). Furthermore, "[w]here, as here, defendants have acted with intent to eliminate competition, the proof of resulting injury need not be overwhelming." *D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir.1982); *see also Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp.*, 264 F.2d 602, 608 (9th Cir.1958) ("[The fact of] damage need not be made patent item by item as on a balance sheet. The mere unlawful combination over a period of time to eliminate competition is proof of damage.").

Second, Qwest contends that even if MetroNet has established injury in fact, it has not established causation because any decline in MetroNet's profitability was due not to per location pricing, but rather to the entry of new competitors after passage of the 1996 Act, the precipitous drop in 1FB rates imposed by the WUTC in 1998, the advent of competing modes of access such as T–1 and DSL and heavy personnel turnover at MetroNet.

■ To establish causation, MetroNet need only show that per location pricing was a "material cause" of MetroNet's injury. *See Zenith Radio Corp.*, 395 U.S. at 114 n. 9, 89 S.Ct. 1562 ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury. ...."). We have interpreted this to mean that the plaintiff must "establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue." *Blanton*, 721 F.2d at 1215 (internal quotation marks omitted). MetroNet must therefore show that "the antitrust violation contribute[d] significantly to [its] injury, even if other factors amounted in the aggregate to a more substantial cause." 2 Areeda & Hovenkamp, Antitrust Law § 338a, at 317 (2d

ed.2000) (interpreting *Zenith* ). However, MetroNet's claim fails as a matter of law if MetroNet would have suffered the same injury even without per location pricing. *See Brunswick Corp.*, 429 U.S. at 487–88, 97 S.Ct. 690; *see also* 2 Areeda & Hovenkamp § 338b, at 320–21 (noting that no material cause can be demonstrated where an independent cause fully accounts for the claimed antitrust injury).

The other possible causes of MetroNet's woes do not negate MetroNet's evidence that per location pricing played a material role in causing its injury. Therefore, MetroNet has proffered sufficient evidence to create a triable issue of fact as to causation.

■ Finally, Qwest contends that MetroNet has failed to show that its injury is the type of injury the antitrust laws were designed to prevent, such that Qwest's conduct has harmed consumer welfare. A showing of such injury is distinct from the question of causation. *Brunswick*, 429 U.S. at 487–89, 97 S.Ct. 690 (noting that antitrust violations can cause "losses which are of no concern to the antitrust laws" and that "plaintiffs ... must prove more than injury causally linked to an illegal presence in the market").

■ The antitrust laws are intended to protect competition, not competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior. ... If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury. ..." *Rebel Oil*, 51 F.3d at 1433. Where the defendant's illegal conduct harms the plaintiff without adversely affecting competition generally, we have found no antitrust injury. *See, e.g., Pool Water Prods. v. Olin*

*Corp.,* 258 F.3d 1024, 1034–36 (9th Cir. 2001).

MetroNet's CEO Seeley claims Metro-Net's financial losses flowed from Qwest's imposition of per location pricing. It appears that some customers left MetroNet at least in part because of the higher price for features, although this point is disputed, and that MetroNet increasingly found itself unable to make a profit on the customers who remained. We have already concluded that MetroNet has proffered sufficient evidence of an anticompetitive effect to establish exclusionary conduct. We further conclude that, for purposes of avoiding summary judgment, MetroNet has proffered sufficient evidence to establish that its injury flowed from the anticompetitive effects of per location pricing.

We hold that at this stage in the litigation MetroNet has adduced sufficient evidence of monopoly power, exclusionary conduct and antitrust injury to proceed with its monopolization claim.

### 2. The Essential Facilities Claim

"The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,* 848 F.2d 976, 983 (9th Cir.1988). The origin of the doctrine is generally traced to *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), in which the Supreme Court held that the defendants, railroad companies that jointly owned all rail terminal facilities across the Mississippi at St. Louis, could not deny their competitors access to those facilities on reasonable terms because such access was essential to competition. A denial of access to an essential facility violates Section 2 because control of an essential facility can "extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. AT&T Co.,* 708 F.2d 1081, 1132 (7th Cir.1983).

In order to prevail on its essential facilities claim, MetroNet must prove (1) that Qwest is a monopolist in control of an essential facility, (2) that MetroNet, as Qwest's competitor, is unable reasonably or practically to duplicate the facility,[25] (3) that Qwest has refused to provide MetroNet access to the facility and (4) that it is feasible for Qwest to provide such access.[26] *See City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1380 (9th Cir.1992) (citing *MCI Communications Corp.,* 708 F.2d at 1132–33). The district court found that MetroNet could not prove any of the first three elements.[27] We disagree.

Under the first element, "[a] facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 544 (9th Cir.

---

**25.** We have "point[ed] out that the second element is effectively part of the definition of what is an essential facility in the first place. That is to say, if the facility can be reasonably or practically duplicated it is highly unlikely, even impossible, that it will be found to be essential at all." *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1380 (9th Cir. 1992).

**26.** We have "pointed out that the fourth element basically raises the familiar question of whether there is a legitimate business justification for the refusal to provide the facility." *City of Anaheim,* 955 F.2d at 1380.

**27.** The parties do not dispute that MetroNet can satisfy the fourth element of its essential facilities claim.

1991). The alleged essential facility in this case is Qwest's comprehensive local exchange network. Resellers obtain access to that network through the Centrex product. Thus, the claim is that Qwest has denied resellers like MetroNet access to its network by effectively eliminating the market for Centrex resale.

The district court concluded that Metro-Net could not establish Qwest's control of this facility because the 1996 Act requires Qwest to provide competitors with interconnection and with access to calling features. Responding to MetroNet's argument that Qwest's exclusionary pricing prevented MetroNet from reasonable access to Qwest's local exchange network, the district court concluded:

> Even if the per location pricing policy makes the calling features available to MetroNet and other firms on terms that make resale of those features unprofitable, there will still be competition in the market for local business phone service from wholesalers and from firms with their own facilities who have interconnected with Qwest's physical network under the Telecom Act.

This conclusion—although perhaps plausible—is not supported by the record. MetroNet's draft marketing report and the depositions of Tatman and Beckett, when viewed in the light most favorable to Me-troNet, do not support an inference of effective or sustained competition. Furthermore, MetroNet's experts Wilson and Cornell stated in their reports that Qwest did not face effective competition. Wilson stated that "there are no practical alternatives for service for small businesses other than [Qwest] provided service or service provided by Centrex resale such as that provided by MetroNet." In light of the record on summary judgment, the district court erred in assuming, to MetroNet's detriment, that the passage of the 1996 Act in fact caused Qwest to "open access to at least part of its essential facility." [28]

With respect to the second element, Me-troNet must show its inability practically or reasonably to duplicate the facility. The district court concluded that Metro-Net could not establish a lack of reasonable alternative means of access to Qwest's essential facility. The court found that competitors could gain access to Qwest's facility by purchasing 1FB lines and certain calling features from Qwest at wholesale prices and reselling them for a profit. The court also found that MetroNet had failed to rebut evidence that features could be purchased on the open market at competitive prices. The record does not support either conclusion.

There is no evidence that 1FB lines can be purchased at wholesale prices and resold profitably, and MetroNet, which bears the burden of proof, adduced evidence to the contrary. MetroNet expert Cornell stated: "[t]here is no evidence in this case that ... MetroNet could turn to other providers for the essential inputs to

---

**28.** Pursuant to the interconnection provisions of the 1996 Act, MetroNet signed an interconnection agreement with Qwest in August 2000. MetroNet, however, has not made use of that agreement. Qwest argues on appeal that the interconnection agreement proves that Qwest lacks control over an essential facility and that even if Qwest does have such control, it has not denied access to MetroNet. MetroNet's CEO Seeley stated in his declaration, however, that "the wholesale interconnection agreement option was not a realistic option at all." According to Seeley, Qwest refused to include long-distance and voice mail services in the agreement, which meant that end users would have to move to another service provider. As a result, according to Seeley, MetroNet would lose 30 to 40 percent of its business. The mere fact that MetroNet signed an interconnection agreement does not negate MetroNet's evidence that Qwest controls an essential facility and that it denied MetroNet reasonable access to that facility.

provide services to small business users." MetroNet's CEO stated that the resale of 1FB lines is "an illusion," and that "if we resold 1FBs we would be insolvent immediately." He did not provide an explanation for these statements, but the reasonable inference on summary judgment is that the difference between the wholesale and resale prices of 1FB lines is not enough for MetroNet to make a profit through resale. This inference is supported by MetroNet expert Wilson's statement that the wholesale discount on business lines is too small to encourage competition. If 1FB lines could not be resold profitably, the question whether MetroNet could purchase features on the open market at competitive prices is not dispositive. Although MetroNet's COO Bogus testified on deposition that MetroNet could purchase voice mail from vendors other than Qwest, there is no evidence that MetroNet could do so profitably. There is also no evidence that MetroNet could purchase features from Qwest without also purchasing Centrex access.

▆▆▆▆▆▆ The third element of MetroNet's essential facilities claim requires a showing that Qwest denied MetroNet access to the facility. Access need not be denied absolutely; unreasonable terms and conditions of access, such as the services provided or the rates charged, may result in practical denial of access. *See, e.g., Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 544–45 (4th Cir.1991); *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 180 (2d Cir.1990). However, providing access at a fee that is not so high as to drive away competition does not amount to a denial of access. *Alaska Airlines,* 948 F.2d at 545–46. *See also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996). The district court, citing *Alaska Airlines,* correctly stated the test as follows: "Qwest would deny MetroNet access to its essential facility if it simply

refuse[d] MetroNet any access to its facility, or price[d] access to that facility in a way that would 'drive [MetroNet] away.' " MetroNet does not claim that Qwest has denied it all access; rather, MetroNet claims that per location pricing had the effect of driving it out of the market.

The district court required MetroNet to show (1) that per location pricing made MetroNet's resale of Centrex unprofitable and (2) that *"any* unprofitability was caused *solely* by Qwest's pricing policy." (Emphasis added.) The first requirement is largely correct; the second overstates MetroNet's burden. As to the first requirement, it is not enough for MetroNet to show that per location pricing merely decreased its profitability; MetroNet must show that the decrease in profitability due to per location pricing was significant enough to discourage MetroNet from staying in the business. In other words, MetroNet must show that per location pricing made the Centrex resale business unprofitable, or squeezed the profit margin to the point where the game was no longer worth the candle. As to the second requirement, MetroNet need not prove that all of its financial woes were caused by per location pricing; rather, it must show that the financial harm attributable to per location pricing—apart from the financial harm due to other causes—was alone sufficient to drive it out of the market. *See Alaska Airlines,* 948 F.2d at 545–46.

MetroNet's only evidence in support of its claim that per location pricing had the effect of driving it and other resellers away is the declaration of its CEO. Seeley claims that as a direct result of per location pricing, MetroNet began to slide toward unprofitability in 1997 and was in fact unprofitable in 1999 and 2000. He further claims that several of MetroNet's competitors left the Centrex resale business and that one competitor went bank-

rupt because of per location pricing. Seeley's testimony as to MetroNet's unprofitability is disputed. MetroNet's bookkeeper testified that MetroNet was profitable in 1999. Although the bookkeeper did not address MetroNet's overall profitability in 2000, he testified that for the first nine months of that year, MetroNet's revenues from the resale of Centrex exceeded MetroNet's cost of purchasing Centrex from Qwest. As we noted in our discussion of the monopolization claim, this evidence of the injury to MetroNet is weak. So too is the evidence of injury to other resellers. However, our role on summary judgment is not to weigh the evidence. We must determine simply whether the evidence, when viewed in the light most favorable to MetroNet, creates a triable issue of fact. We hold that MetroNet has met this burden with respect to whether per location pricing alone had a sufficiently adverse financial impact to drive MetroNet and other resellers away. *Id.* at 546 ("When a firm's power to exclude rivals from a facility gives the firm the power to *eliminate* competition in a market downstream from the facility, and the firm excludes at least some competitors ... a finding of monopolization, or at least attempted monopolization, is appropriate ..." (emphasis in original)). Qwest came forward with some evidence of other reasons for MetroNet's unprofitability, but this evidence is insufficient to resolve the issue in Qwest's favor on summary judgment.

We hold that at this stage in the litigation MetroNet has adduced sufficient evidence to proceed with its essential facilities claim.

## II. Settlement Agreement

### A. Standard of Review

■■■■ The parties dispute the standard of review we should apply to the district court's denial of MetroNet's motion to enforce its purported settlement agreement with Qwest. MetroNet urges de novo review,[29] whereas Qwest argues for an abuse of discretion standard.[30] The arguments of both parties assume that state law should govern the choice of the standard of review. We disagree. "[T]he proper standard of review is a question of federal procedure and is governed by federal law." *West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 350 (9th Cir.1989) (diversity breach of contract case). Although Washington's substantive law governs the interpretation of the settlement agreement, federal law governs the standard of review to be applied to the district court's decision. *Id.* We review a district court's decision whether to enforce a settlement agreement under an abuse of discretion standard. *See Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987).

■■■■ MetroNet argues that an abuse of discretion standard should not apply because the material facts are not in dispute and the only issue is whether the parties manifested an intent to be bound by the settlement agreement. We have recognized a district court's inherent power to enforce a settlement agreement in a case

---

**29.** MetroNet cites *Lavigne v. Green*, 106 Wash. App. 12, 23 P.3d 515, 518 (2001); *Brinkerhoff v. Campbell*, 99 Wash.App. 692, 994 P.2d 911, 914 (2000); *In re Patterson*, 93 Wash.App. 579, 969 P.2d 1106, 1109 (1999); and *In re Marriage of Ferree*, 71 Wash.App. 35, 856 P.2d 706, 710–11 (1993). These cases hold that where the moving party relies on affidavits or declarations to show that a settlement agreement is not genuinely disputed, the standard of review should be the same as that applied in summary judgment proceedings.

**30.** Qwest cites *Morris v. Maks*, 69 Wash.App. 865, 850 P.2d 1357, 1358 (1993), which in turn relied on our holding in *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987).

**1014**

pending before it. *See In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994). "To the extent the court's power to enforce a settlement agreement falls within the court's role as supervisor of litigation, then ... this is precisely the type of determination that normally receives a deferential, abuse of discretion review." *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir.1995) (citing *Pierce v. Underwood*, 487 U.S. 552, 558 n. 1, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

## B. Discussion

In Washington, settlement agreements are governed by general principles of contract law. *See Morris*, 850 P.2d at 1359. In determining whether an unexecuted settlement agreement constitutes a binding contract, Washington courts consider whether (1) the subject matter has been agreed upon, (2) the terms are all stated in the agreement and (3) the parties intended a binding agreement prior to the time of signing and delivery. *Id.* (citing *Loewi v. Long*, 76 Wash. 480, 136 P. 673, 674 (1913)). "If the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain, then a contract exists between them by virtue of the informal writings, even though they may contemplate that a more formal contract shall be subsequently executed and delivered." *Loewi*, 136 P. at 674.

MetroNet has the burden of establishing the existence of an enforceable agreement. *Johnson v. Nasi*, 50 Wash.2d 87, 309 P.2d 380, 382 (1957) ("The burden of proving a contract, whether express or implied, is on the party asserting it, and he must prove each essential fact, including the existence of a mutual intention."). The district court concluded that MetroNet failed to establish the parties' intent to be bound prior to execution of the agreement. We agree.

"While the compromise of litigation is to be encouraged, negotiations toward a compromise are not binding upon the negotiators." *Eddleman v. McGhan*, 45 Wash.2d 430, 275 P.2d 729, 730 (1954). In determining whether the parties intended to be bound, we must look to the objective manifestations of their intent rather than to their subjective beliefs. As the Washington Supreme Court has stated:

> The Washington court has long adhered to the objective manifestation theory in construing the words and acts of alleged contractual parties. We impute to a person an intention corresponding to the reasonable meaning of his words and acts. Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties.

*Plumbing Shop, Inc. v. Pitts*, 67 Wash.2d 514, 408 P.2d 382, 384 (1965). We agree with the district court that "[t]he reasonable meaning of the parties' words and acts in this case was that the agreement needed to be signed for the settlement agreement to be complete and binding."

The agreement itself indicates that it was not to become legally operative until execution. First, the agreement requires Qwest to pay the settlement amount 10 days after the date of execution, implying that without execution, Qwest had no obligation to pay. ("Qwest shall pay to MetroNet the sum of $2,450,000 ... within 10 business days of the execution date of this Agreement by MetroNet."). Second, the purported agreement required execution by both parties as attestation of their voluntary and informed consent. ("The parties agree, represent and warrant as follows.... They voluntarily execute this Agreement, after consulting with counsel and without being pressured or influenced by any statement or representation of any person acting on behalf of any other party,

including any other party's officers, directors, employees, agents and attorneys."). Third, the final paragraph of the agreement provides for the method of signing and for the legal effect of signed counterparts. ("This Agreement may be signed in multiple counterparts which may be transmitted via facsimile, with the same effect as if all parties had signed the same agreement. All counterparts shall be construed as and shall constitute one and the same agreement. In proving this Agreement, it will not be necessary to produce or account for the original counterpart signed by the party against whom the proof is being presented.").

More importantly, Qwest manifested its unwillingness to be bound on October 6, 2000, when Qwest failed to sign the agreement as had been expected. As the district court pointed out, "[t]hat act should have put MetroNet on notice that all was not well with the agreement and that perhaps the parties had not reached a full and final resolution of their differences." Qwest's attorney informed MetroNet's counsel on October 6 that she was having difficulty obtaining the signatures necessary to finalize the agreement. This, too, put MetroNet on notice that no final deal had been struck. Furthermore, MetroNet's repeated efforts to obtain Qwest's signature even after October 6, 2000, contradict MetroNet's position that the settlement agreement was intended to be legally operative prior to signing.

## CONCLUSION

For the reasons stated, we affirm the district court's denial of MetroNet's motion to enforce its purported settlement agreement with Qwest, reverse the district court's grant of summary judgment on MetroNet's monopolization [31] and essential facilities claims and remand for further

proceedings. Each party shall bear its own costs.

**AFFIRMED in part, REVERSED in part and REMANDED.**

---

31. Except as to the district court's grant of summary judgment adverse to MetroNet on its claim of attempted monopolization, as discussed in notes 1 and 16, *supra*.