**Gary GERLINGER, individually, on behalf of all others similarly situated, and on behalf of the California general public, Plaintiff,**

v.

**AMAZON.COM, INC.; Borders Group, Inc.; Borders, Inc.; Borders Online, LLC; and Borders Online, Inc., Defendants.**

No. C 02–05238 MHP.

United States District Court,
N.D. California.

March 23, 2004.

Robert C. Schubert, Juden Justice Reed, Miranda Kolbe, Schubert & Reed LLP, San Francisco, CA, Roy A. Katriel, The Katriel Law Firm, P.L.L.C., Washington, D.C., for Plaintiff.

Joel S. Sanders, George Charles Nierlich, Gibson, Dunn & Crutcher LLP, Reginald D. Steer, Akin Gump Strauss Hauer & Feld, San Francisco, CA, Dianne L. Sweeney, Pillsbury Winthrop LLP, Palo Alto, CA, for Defendants.

### *MEMORANDUM & ORDER RE: PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

PATEL, Chief Judge.

Plaintiff challenges an agreement between Amazon.com, Inc. and Borders Online, LLC as violating federal and California antitrust laws, the California unfair competition law and the common law of unjust enrichment. Defendants have moved for summary judgment on all claims. Plaintiff moves for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or in the alternative, for a continuance pursuant to Rule 56(f) to conduct further discovery. Having considered the submissions of the parties, and for the reasons set forth below, the court rules as follows.

*BACKGROUND*[1]

Plaintiff is a consumer who purchases books online and who "purchased books directly from at least one of the [d]efendants." FAC ¶ 10. Amazon.com Inc. ("Amazon") is a market leader in the online retail book market. Amazon has invested hundreds of millions of dollars in technology and the content design of its website, Amazon.com. Declaration of Steven Kessel ("Kessel Decl.") at ¶ 6. In addition to selling products to consumers, Amazon.com generates revenue by providing technology and business services to other retailers. Declaration of Daniel Cooper in Support of Defendants' Motion for Summary Judgment ("Cooper Decl.")[2] at ¶ 3. Beyond selling its own products on its website, Amazon.com operates Amazon Marketplace where sellers of new and used books (among other products) offer their products for sale on the Amazon.com website. When a visitor to the Amazon.com website searches for a book title, they will be provided with both the Amazon.com offering for that title as well as any available Marketplace seller's offering and prices for that title, even if the price is lower than that offered by Amazon.com. *Id.* at ¶ 5. *See also* Declaration of Kyle Graham ("Graham Decl.") at ¶ 2 (copy of book *Empire Falls* available on Amazon.com website through Amazon.com for $14.46 and from Amazon Marketplace sell-

---

1. Unless otherwise noted, facts are taken from the First Amended Complaint.

2. Unless otherwise specified Declarations referred to in the background section will be those filed in support of the Defendant's Motion for Summary Judgment.

er for $11.37, both including standard shipping).

Amazon.com also hosts auction sites on its website, where sellers offer products available for consumers to bid on. Merchants can also establish their own "storefronts" through Amazon.com's zShops, which enables sellers to offer their merchandise for sale at the prices they choose. Thus, a given product on Amazon.com's website may be listed for sale simultaneously by Amazon.com as well as several different Marketplace, zShops, and auction sellers. Cooper Decl. at ¶ 6.

Amazon.com has also entered into collaborations with other retailers. These collaborations take many different forms. For example, Amazon.com and Toys 'R' Us agreed to launch a toy and video game store on the Amazon.com website. In that arrangement, Toys 'R' Us supplies the inventory and Amazon.com provides the hosting, order fulfillment and customer relations services. Cooper Decl. at ¶ 7. For Target Stores, Amazon.com operates Target's website selling Target's products under the Target brand name.

Amazon.com also has arrangements with a number of partners who wish to maintain a presence on the web but do not wish to incur the cost involved in selling products through the Internet. In these arrangements ("Syndicated Stores") Amazon.com uses the partner's website, (which site retains the partner's name and URL) but Amazon.com sells its own products and is responsible for filling orders and for customer service. Amazon.com's partners in these arrangements earn commissions on the products sold through the site. Amazon.com has a "Syndicated Store" arrangement with Borders as well as with partners such as Virgin Mega stores and Waterstones in the United Kingdom. *Id.* at ¶ 8.

Defendant Borders, Inc. is a wholly-owned subsidiary of defendant Borders Group, Inc. Defendant Borders, Inc. (collectively "Borders") operates and manages more than 400 brick-and-mortar stores. Declaration of Edward Wilhelm ("Wilhelm Decl.") at ¶ 2. Borders touts itself as the nation's second largest operator of retail book "superstores." Borders did not launch a website until 1998 and even then did so with some reservations based on its lack of experience as an Internet retailer and the fact that at that point the ability to earn an acceptable return on investment in the Internet arena was uncertain. *Id.* at ¶ 5. Borders did not make a large capital investment in its website. *Id.* at ¶ 7. Borders instead invested in expansion and improvement of its brick-and-mortar stores. *Id.* at ¶ 8.

Between 1998 and 2000, Borders.com sales accounted for less than 1% of Borders' total consolidated sales. Sales on the Borders.com website account for less than one-tenth of one percent of industry-wide book sales (i.e., both online and brick-and-mortar stores book sales). Kessel Decl. at ¶ 14; Graham Decl., Exh. L at 2 and Exh. M.[3]

---

**3.** Plaintiff alleges that Amazon.com's "main competition came from, inter alia, its rival Borders, which operated the competing website *www.borders.com*. FAC at ¶ 23 ("Prior to the commencement of the Class Period, Amazon's main competition in the online sales of books within the United States were *www.borders.com* ... and www.barnesandnoble.com.") (emphasis added) The clear impression which plaintiff seeks to make is that

Borders.com was a direct threat to Amazon.com. Both Borders and Amazon.com denied this allegation in their answers to the First Amended Complaint. *See* Border's Answer filed April 23, 2003, ¶ 23; Amazon's Answer filed April 23, 2003, ¶ 23. For purposes of a motion for judgment on the pleadings, defendants' denials are assumed to be true. *See FDIC v. Hudson,* 800 F.Supp. 867, 869 (N.D.Cal.1990)

Although sales on Borders.com increased, so did its losses. Wilhelm Decl. at ¶ 9 (In fiscal year 1999, Borders.com generated sales of $17.9 million and losses of $17.2 million but in fiscal year 2000, Borders.com lost $29.7 million on sales of $27.4 million). Because of these losses, in 2000 Borders considered various options in regards to its website such as shutting it down, spinning it off as a public company or outsourcing the web site to a third party.[4] In November of 2000, Borders began discussions with Amazon.com about a co-branded website. *Id.* at ¶¶ 10–12. At this time Amazon.com was actively pursuing its strategy of providing technology and business services to other retailers and believed that entering a venture with Borders would "further validate its model of providing services to brick-and-mortar retailers." Cooper Decl. at ¶ 11. Moreover, the Agreement with Borders helped Amazon.com achieve additional economies of scale, thus reducing Amazon's costs. *Id.* At ¶ 11; Kessel Decl. ¶ 18.

In April 2001, Amazon and Borders executed a "Syndicated Store" agreement (the "Agreement" or "Mirror Site Hosting Agreement") under which they would jointly relaunch *www.borders.com* as a co-branded website.[5] The Agreement provides that *www.borders.com* will be operated by Amazon and that Amazon will provide the inventory fulfillment, customer services, and site content for the new co-branded website. Under the Agreement, Amazon.com unilaterally determines the selection of products offered, the terms of sale and the prices for the books sold on the web site except for those books available for instore pickup at a Borders brick-and-mortar store. Borders sets the price for books to be purchased online but picked up in its stores. Wilhelm Decl. at ¶ 13.

Amazon is the actual seller of the books sold on the website and accordingly retains proceeds for those sales. Borders paid Amazon.com a one-time fee for creating the website and Borders receives a commission on each sale. Defendants assert that the Agreement is a service agreement. Amazon must achieve certain service levels or risk being in breach of the Agreement which would enable Borders to terminate the Agreement prior to the expiration of the Agreement term (originally two years, then extended an additional three years). Borders alleges that its objectives in entering into the Agreement were to "maintain a retail presence on the Internet, preserve a connection from the Internet back to [their] stores, reduce [their] losses and improve [their] financial returns." Wilhelm Decl. at ¶ 12. The Agreement has no impact on the legal ownership of the *www.borders.com* URL which continues to be held by Borders. In April 2002, the parties extended the Agreement to include the *www.waldenbooks.com* site as well. Cooper Decl. ¶ 16

Plaintiff generally alleges that the Agreement eliminates competition between two former rivals in the market for online sales of books and that consumers are therefore denied a competitive choice for their online book purchases. As discussed in detail below, plaintiff claims that two provisions of the Agreement are *per se* violations of the antitrust laws.

Earlier in 2003 Defendants brought a motion to dismiss several counts of plaintiff's complaint. At the hearing on April 7, 2003 this court denied defendant's motion to dismiss without prejudice for renewal of

---

4. Borders was taken to task by its shareholders in a December 2000 SEC filing for its failure to have a clear web strategy.

5. Defendant Borders Online Inc. is also a subsidiary of Borders Group, Inc. and is the assignee of the agreement that was entered into with Amazon.

it on a motion for summary judgment. *See* Hearing Transcript attached as Exh. A to the Declaration of Roy Katriel in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Katriel Decl.")

Defendants have now filed a motion for summary judgment and plaintiff has filed a Motion for Judgment on the Pleadings as to liability on counts II, IV, V, VI, and VII of the First Amended Complaint.

*LEGAL STANDARD*

A. *Motion for Judgment on the Pleadings*

After all parties have submitted their pleadings, any party may invoke Federal Rule of Civil Procedure 12(c) and move for judgment on the pleadings as long as consideration of the motion does not delay trial. Fed.R.Civ.P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989). The court accepts all allegations of the nonmoving party as true. *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir.1984). If the court reviews matters outside the pleadings, the motion is properly treated as a motion for summary judgment. Fed.R.Civ.P. 12(c). In deciding such a motion, the court may also consider facts that are properly the subject of judicial notice. Cf. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986). Interpretation of a contract is a purely legal question which is susceptible to a motion for judgment on the pleadings. Cf. *Atel Financial Corp. v. Quaker Coal Co.*, 321 F.3d 924, 925–26 (9th Cir.2003)(interpretation of a contract is a pure question of law).

■ Defendants assert that plaintiff has not met the legal standard for judgment on the pleadings. A plaintiff is not entitled to judgment on the pleadings if the defendant's answer raises issues of fact or an affirmative defense, which, if proved, would defeat plaintiff's recovery. *Qwest Communications Corp. v. City of Berkeley*, 208 F.R.D. 288, 291 (N.D.Cal.2002)(plaintiff's motion on the pleadings can be granted only if all affirmative defenses raised in answer are legally insufficient). Both Borders and Amazon.com in their answers to the FAC, raised the affirmative defenses that plaintiff lacked standing and that he had suffered no antitrust injury. Plaintiff has not countered these defenses in his motion.

In order to determine whether the plaintiff has "antitrust standing" the court must evaluate the plaintiff's harm, the alleged wrongdoing by the defendants and the relationship between them. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir.2000). As discussed below, plaintiff has made no showing that the alleged price-fixing, if analyzed pursuant to the rule of reason would in fact be detrimental to plaintiffs. On first blush it appears that section 4.3 of the Agreement would lead to lower prices available to consumers on the Borders.com website. Plaintiff has adduced no evidence that, but for Section 4.3 Amazon would have lowered its prices but did not do so because it would have been obligated to list the lower prices on both the Borders.com website and the Amazon.com website. In contrast, Amazon.com has introduced evidence that despite Section 4.3 of the Agreement, Amazon.com has lowered prices five times since July 2001. Kessel Decl. at ¶ 5; Zapolsky Decl. Exh. T.

Nor has plaintiff demonstrated that he has suffered an "antitrust injury." Injury that flows from aspects of a defendant's conduct that are beneficial or neutral to competition is not "antitrust injury." *MetroNet Servs. v. U.S. West*, 329 F.3d 986 (9th Cir.2003); *Rebel Oil*, 51 F.3d at 1433. Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury. *MetroNet Servs.*, 329 F.3d 986; *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034–36 (9th Cir.2001).

The court questions plaintiff's standing and whether plaintiff has suffered an "antitrust injury." Nonetheless, the court will analyze the claims presented.

### B. *Motion for Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial … since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The court's function on a motion for summary judgment is not to make credibility determinations. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *See T.W. Elec. Serv.*, 809 F.2d at 631.

In an antitrust case, "if the factual context renders [plaintiff's] claim implausible if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The idea that Amazon and Borders are trying to maintain some artificially high price structure to the detriment of consumers is fairly ludicrous on its face as both the Amazon and Borders websites list numerous third party sellers of the same books Amazon and Borders are offering without any attempt to regulate the prices offered by these third parties and with the effect that these parties frequently offer lower prices than those of offered by Amazon. *See* Graham Decl. and related exhibits.

### C. *Motion for a Continuance Under Federal Rule of Civil Procedure 56(f)*

Pursuant to Federal Rule of Civil Procedure 56(f), upon a showing by the party

opposing a motion for summary judgment that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," the court may deny or continue the motion for summary judgment in order to permit that party an opportunity to obtain necessary discovery. "Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact." *Continental Maritime v. Pacific Coast Metal Trades,* 817 F.2d 1391, 1395 (9th Cir.1987).

A Rule 56(f) motion should be granted where the party opposing summary judgment makes a timely application that specifically identifies relevant information to be discovered, and there is some basis for believing that such information actually exists. *VISA Int'l Serv. Ass'n v. Bankcard Holders,* 784 F.2d 1472, 1475 (9th Cir. 1986). Granting of such a motion is particularly appropriate where the identified information is the subject of outstanding discovery requests. *Id.*

DISCUSSION

I. *The Antitrust Claims: Alleged Per Se Violations*

■ Plaintiff's motion for judgment on the pleadings hinges primarily on interpretation of two provisions of the Agreement: one regarding prices and the other provision which limits Borders from engaging in other online retailing pursuits during the time of the Mirror Site Hosting Agreement. Plaintiff asserts that both of these provisions independently constitute *per se* violations of 15 United States Code, section 1 ("the Sherman Act"). The court will address each of these arguments in turn.

A. *Allegations of Per Se Price Fixing*

Section 1 of the Sherman Act forbids contracts, combinations, or conspiracies in restraint of trade, including price-fixing agreements between competitors. *See* 15 U.S.C. § 1. The Mirror Site Hosting Agreement is without question, an "agreement." The question is whether the Agreement is "unreasonable" under section 1. *Am. Ad. Mgmt.,* 92 F.3d at 788. *See also N'west Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). To determine whether the agreement is unreasonable, the court must decide at the threshold whether it is *per se* illegal or whether it must be analyzed under the "rule of reason." *Paladin Assoc., Inc. v. Montana Power Co.,* 328 F.3d 1145, 1155 (9th Cir.2003).

Treating an agreement as *per se* illegal is appropriate only if the agreement falls within the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N'west Wholesale Stationers,* 472 U.S. at 289, 105 S.Ct. 2613, 86 L.Ed.2d 202. The decision to apply the *per se* rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id.* at 289–90, 105 S.Ct. 2613, 86 L.Ed.2d 202. *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)("*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct.").

Price fixing occurs when two competitors jointly set prices for their respective goods. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 9,

99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Impermissible price-fixing arrangements are not limited to agreements to charge uniform or identical prices. *See e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 222, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)(combination with the purpose and effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* ); *Local 36 of Intern. Fishermen & Allied Workers of Am. v. United States,* 177 F.2d 320, 337 (9th Cir.1949) (same); *In re Wheat Rail Freight Antitrust Litig.,* 579 F.Supp. 517, 538 (N.D.Ill. 1984), *aff'd* 759 F.2d 1305 (7th Cir.1985)(agreement which sets manner in which rates/prices are calculated illegal price fixing).

Plaintiff alleges that the Agreement contains a "price fixing arrangement," which arrangement, he alleges, is a *per se* violation of Section 1 of the Sherman Act. The provision in question, Section 4.3 of the Agreement provides that:

> As between the Parties, Amazon.com or its Affiliates will determine the prices and other fees and terms and conditions (including without limitation, shipping and handling) for all Products offered for sale through the Mirror Site and the Amazon.com Site; *provided, that process, other fees, and terms and conditions for sale of the Mirror Products through the Mirror Site will be at least as favorable as the prices offered for each of the same Mirror Products sold through the Amazon.com site (other than any applicable taxes required or*

> *chosen to be collected through the Mirror Site).*

Wilhelm Decl., Exh. B, at p.8 (Agreement § 4.3 (emphasis added)).

The parties agree that this section of the Agreement forbids Amazon from selling a book on its own site at a price lower than the price for which Amazon offers the book for sale at the *www.Borders.com* site. Beyond this, the parties hotly contest the effect of this section. Plaintiff interprets this language as a horizontal price-fixing term that is *per se* unlawful. Neither party has cited to the court a case with a similar type of arrangement.[6] While bookselling, including online book-selling is not a new industry, the court is required in this case to determine whether the *per se* analysis should apply to a new method of marketing.

The court concurs that section 4.3 of the Agreement concerns prices. However, the court rejects plaintiff's suggestion that because the provision of the Agreement may have an affect on prices, that it is automatically a *per se* illegal "price-fixing agreement." The court is not persuaded by plaintiff's citations on this point to *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *United States v. Masonite Corp.,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); and *General Cinema Corp. v. Buena Vista Distribution Co., Inc.,* 532 F.Supp. 1244 (C.D.Cal.1982). Although in each of these cases *per se* price-fixing was found, none of the agreements is sufficiently similar to the Mirror Site Hosting Agreement to be persuasive. In *Catalano* competing whole-

---

**6.** This court is therefore cautioned by the Supreme Court's admonishment that "the *per se* rule is not [to be] employed until after considerable experience with the type of challenged restraint." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 20 n. 33, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)("*BMI*"). Plaintiff's citation to *Bhan v. NME Hospitals,*

*Inc.,* 929 F.2d 1404, 1412 (9th Cir.1991) further supports the notion that a court must proceed cautiously before creating new categories for application of the *per se* rule. Like in *Bhan,* the court suspects that plaintiffs here seek application of the *per se* rule "because it greatly simplifies the proof required." *Id.* at 1410.

salers conspired to fix credit terms offered to customers. *See Catalano,* ·446 U.S. at 644–45, 100 S.Ct. 1925. In *Masonite,* the relevant contracts provided for specific minimum prices. *See Masonite,* 316 U.S. at 271, 62 S.Ct. 1070. In *General Cinema,* the parties arranged to "split" rights of first negotiation for new films. *See General Cinema,* 532 F.Supp. at 1256–57.

As the Supreme Court stated in *BMI,* "not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *BMI,* 441 U.S. at 23, 99 S.Ct. 1551. In order for the court to apply the *per se* rule plaintiff must convince the court that Amazon's agreement not to undercut the prices it offers on behalf of its partner "threatens the 'central nervous system of the economy,' that is, competitive pricing." *BMI,* 441 U.S. at 23, 99 S.Ct. 1551, quoting *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

Plaintiff takes many different runs at trying to explain how this section amounts to price-fixing. Defendant and Plaintiff concur that a company can unilaterally set the price of its own products. However, plaintiff rejects the premise that Amazon.com can in fact make pricing decisions unilaterally for the books offered on the two sites. Plaintiff claims that Section 4.3 of the Agreement "limits the parties' discretion to price products on the two sites." Pl. Opp. To Def's Motion for Summary Judgment at 4:21–23.[7] Plaintiff argues that Amazon's discretion in setting prices would end were Amazon to use that discretion to set a more advantageous price for a book on its own website than it were to set on the *www.Borders.com* site. Plaintiff takes this argument one step further alleg-

ing that the Agreement is "a binding assurance that Amazon.com will not price the books it sells on the *www.Amazon.com* website below a certain threshold." Plaintiff's Reply Brief in Support of Motion for Judgment on the Pleadings at 3:11–14. The court finds this last interpretation to be a blatant misconstruction of Section 4.3. The court finds that nothing in the Agreement would ban Amazon.com from selling each and every book on its website for $1 as long as the same price were listed on the Borders.com website.

Defendant counters that since all the books belong to Amazon, Amazon is only setting prices for its own product. Defendants cite the *BMI* case in defense of their Agreement. While the case at bar does have certain similarities to the BMI case the facts of the *BMI* case are not sufficiently similar to the current case to provide this court with an easy answer. In *BMI,* the Supreme Court focused on the question of whether the fees BMI and ASCAP set for blanket licensing agreements of individual copyright owners' works constituted *per se* unlawful price-fixing. The Supreme Court upheld the blanket licensing fee based on the Court's finding that:

> [T]he blanket-license fee is not set by competition among individual copyright owners, and it is a fee for the use of any ¨of the compositions covered by the license. But the blanket license cannot be wholly equated with a simple horizontal arrangement among competitors. ASCAP does set the price for its blanket license, but that license is quite different from anything any individual owner could issue. The individual composers and authors have neither agreed not to sell individually in any other market nor

---

7. Plaintiff additionally asserts that the restriction is enforceable "by both parties." *Id.* at 5:2. The court finds however, that the re- striction runs only to Amazon—it requires nothing of Borders.

use the blanket license to mask price fixing in such other markets. Moreover, the substantial restraints placed on AS-CAP and its members by the consent decree must not be ignored.

BMI at 23–24.

The Agreement between Amazon and Borders is substantially different from the agreement between ASCAP and BMI and the composers; the service offered by the blanket license fee was both unique to the music industry and had been tested many times over in prior litigation. Thus, the Supreme Court's holding in *BMI* does not mandate a particular conclusion regarding the Mirror Site Hosting Agreement.

Plaintiff avers that the Agreement constitutes horizontal price-fixing since it "gives Borders the right to control the minimum price at which books will be sold, even when those books do not belong to Borders." *Id.* at 7:13–15. Plaintiff looks to *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), for support that an agreement which sets an outside price range is a "naked restraint" on trade.

In *Maricopa County*, a group of Arizona doctors agreed through their affiliation in a medical foundation to adhere to a fee schedule establishing a maximum payment that any participating physician could collect from his or her patients who had medical insurance. Nothing prevented the physicians from charging less than the maximum, but they could never charge more that the agreed upon upper limit. The Supreme Court disallowed the agreement, finding it *per se* price-fixing. *Id.* at 357, 102 S.Ct. 2466.[8]

The court does not find that the Agreement at issue here contains the same constrictions as the agreement in *Maricopa County*. Read literally, the Agreement does not mandate a minimum price as plaintiff suggests. Conceivably under the Agreement Amazon could sell a book at a lower price on the Borders.com website than the price it would list the same book for on its own Amazon.com site. Although there would be no apparent business reason for doing so, this is still a relevant consideration in determining whether the provision "fixes" prices. The court finds that the Agreement does not set a minimum, maximum or range for the prices Amazon.com can charge for the books it sells on the web sites. The court concurs with Amazon that it has unfettered discretion to choose a price at which a book will be sold.

The court further finds that the Agreement in any no way affects the prices that Borders can sell books for at its brick-and-mortar stores or the price that Borders sets for books to be purchased on the Borders.com website for books which will be picked up at the store; nor does the Agreement affect the price Borders can list the book for on its own Borders-stores.com site to be reserved and purchased in the store. Thus the court finds that § 4.3 does not constitute *per se* price-fixing.

### B. Allegations that Section 4.3 is at Most an Ancillary Restraint

Defendants propound the same argument both to defend against plaintiff's motion for judgment on the pleadings and in seeking summary judgment on their favor on the Section 1 claim—i.e., that the Agreement is procompetitive and thus permissible under a rule of reason analysis.

 Defendants assert that "even if Section 4.3 could be characterized as af-

---

8. The Supreme Court also rejected the physicians' arguments that the agreement was procompetitive, that the Court had insufficient experience with healthcare industry to make a per se determination

fecting prices, it would still not merit *per se* condemnation because it is an ancillary provision within a procompetitive agreement between Amazon.com and Borders." Section 4.3, defendants argue, is a small part of an arrangement under which Amazon.com agrees to operate and maintain the Mirror Site. An agreement will be reviewed under the rule of reason where the agreement on price is ancillary to the overall agreement. *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 188–89 (7th Cir.1985)(if at the time ancillary restraint was adopted it may promote the success of a more extensive cooperation, then the rule of reason is applied). In *Polk Brothers,* two retailers agreed to share space to provide customers with a full line of home supplies. Polk Bros. sold appliances, Forest Enterprises sold building materials. As part of their agreement, the parties negotiated a fifty year restrictive covenant specifying products that each retailer could and could not sell. *Id.* at 187. The trial court found this arrangement to be a *per se* violation of the antitrust laws, but the Court of Appeal reversed holding that the horizontal restriction was ancillary to the agreement and therefore subject to the rule of reason. *Id.* at 188. The restriction, the court found, was intended to prevent one party "free-riding" off the other. *Id.* at 190.

Defendants argue that the same analysis applies here. Were Amazon.com able to offer lower prices for books on its own website than it did on Borders.com, then shoppers originally lured to the Borders.com site by the Borders name (its contribution to the Agreement) could be induced to purchase the book at a lower price from Amazon.com thus cheating Borders out of its commission. As in *Polk Bros.,* section 4.3 of the Agreement prevents Amazon.com from free-riding off of Borders. *See also Paladin Assoc., Inc. v. Montana Power Co.,* 328 F.3d 1145, 1155 (9th Cir.2003) and *Rothery Storage and*

*Van Co. v. Atlas Van Lines, Inc.* 792 F.2d 210, 229 (D.C.Cir.1986). As the *Polk Bros.* case makes clear, the court may look beyond the language of the agreement to the context in which the agreement was entered to determine whether the provision is ancillary. *Polk Bros.,* 776 F.2d at 189. Looking beyond merely the language of the Mirror Site Hosting Agreement to the conduct of the parties and the context in which the agreement was entered into, the court concurs that § 4.3 is an ancillary provision.

Once the court has determined that the provision is ancillary, then the rule of reason applies. The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. In a rule of reason analysis, the court must review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects. *See N'west Wholesale Stationers,* 472 U.S. at 290–93, 105 S.Ct. 2613; *see also Cal. Dental Ass'n v. FTC,* 224 F.3d 942, 947 (9th Cir.2000) (on remand from the Supreme Court). Amazon.com's agreement with Borders regarding pricing on the two websites is anticompetitive if it "[harms] allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality" *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir. 1995). Currently, the court does not have before it sufficient evidence to make a determination on the issue of whether the Agreement has an anti-competitive effect.

### C. *Allegations of an Impermissible Horizontal Market Allocation*

In the FAC, plaintiff alleges that the provision of the Agreement which limits

Border's online activity is a horizontal market division and *per se* illegal. FAC ¶¶ 46–57; 65–72. Interestingly, plaintiff does not raise this issue at all in his motion for judgment on the pleadings, but defendants raise the issue in their motion for summary judgment.

Amazon.com is the seller of record and inventory supplier of any books sold online either through the *www.Amazon.com* or the *www.Borders.com* website. *See* Agreement §§ 4.2.1 and 4.3. Section 6.1 of the Agreement prohibits Borders from selling any book online directly or through an affiliation with another party. Section 6.1 provides in pertinent part:

> Commencing on the Launch Date and thereafter during the Term, Borders.com will not, and will cause its Affiliates not to, (a) operate, endorse, link to from the Borders.com Hosted Sites, or promote the e-commerce functionality of any web-based or online service that permits Persons not located in a Borders Physical Outlet to purchase products for shipment to a destination not located in a Borders Physical Outlet (e.g. Yahoo! Shopping, Shop@AOL, or barnesandnoble.com); (b) **sell or distribute products for compensation** through any web-based or online service that in either case permits Persons not located in a Borders Physical Outlet to purchase products (e.g. Yahoo! Shopping, Shop@AOL, or barnesandnoble.com).

Agreement § 6.1. (Emphasis added).

Thus, plaintiff asserts, the parties have allocated the online bookselling market venue solely to Amazon.com, leaving Borders to sell books only in the brick-and-mortar venue. Plaintiff claims that as a result of the Agreement two competitors have agreed to divide up a "market" and that this is *per se* impermissible. *Palmer v. BRG of Georgia*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990)(per curiam);

*United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir.1991)

Defendants propose several analyses as to why this provision is not illegal. Defendants assert that the Agreement does not restrict any other sales activity of Borders such as off-line sales of books, use of the Bordersstores.com website for shoppers to reserve books for in-store pick up or Amazon.com's right to build brick-and-mortar stores if it chose. Defendants also argue that the Agreement involves "only an ancillary restraint in the context of an integrative venture with procompetitive goals and effects" and should thus be judged according to the "rule of reason." *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188–89 (7th Cir.1985).

Plaintiff asserts that the holding of *Palmer v. BRG of Georgia*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990)(per curiam) compels a finding of illegal *per se* market allocation. Plaintiffs in Palmer were purchasers of Georgia Bar review courses. Prior to entering into an agreement, defendants BRG and HBJ were competitors each offering bar review courses in Georgia. The *Palmer* defendants entered into an agreement whereby HBJ agreed to turn its Georgia bar review operations over to BRG and to grant BRG an exclusive license to market bar review courses under HBJ's "BarBri" trade name. *Id.* at 47, 111 S.Ct. 401. The *Palmer* plaintiffs moved for partial summary judgment. The Supreme Court reversed denials of summary judgment by both the trial and appeals court, and found the agreement *per se* unlawful. The Court held that:

> Here, HBJ and BRG had previously competed in the Georgia market; under their allocation agreement, BRG received that market, while HBJ received the remainder of the United States. Each agreed not to compete in the other's territories. Such agreements are

anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other. Thus, the 1980 agreement between HBJ and BRG was unlawful on its face

*Id.* at 49–50, 111 S.Ct. 401.

Plaintiff argues that the same rationale applies here because under the Agreement Borders exited the "online book sales **market segment** and allocate[d] that market segment Amazon.com only." Pl. Opp. at 10:24–11:2. (emphasis added) Before the court can determine whether section 6.1 constitutes an agreement to split a market, the court must determine what the relevant market is. In the *Palmer* case, the question was very straightforward, the market was the State of Georgia. Here the question is not so clear. No conclusive evidence has been adduced either by plaintiff or by defendants regarding the appropriate market definition. Amazon.com refers to a survey it conducted to support its allegation that consumers who purchase books online will also be just as likely if not more so to purchase books in a bricks-and-mortar book store and thus the "market" is books sold in all venues. *See* Kessel Decl. at ¶¶ 15–16.[9] (Amazon.com commissioned study by Lewis Mobilio which showed that Amazon.com customers purchased books both online and in brick-and-mortar stores). If this is correct, then the court would find no clear *per se* market allocation. Plaintiff contests the admissibility of this evidence yet offers nothing but unsupported allegations that there is a separate and distinct "online market segment." Without such evidence the court is precluded from finding a *per se* violation such as that found in *Palmer*.

Defendant asserts that this provision is at most an ancillary restraint which prevents "free-riding" by Borders. Defendants also claim that the exclusivity provision is "narrowly limited to the specific area in which Amazon.com and Borders agreed to collaborate—online sales of books for direct home delivery." Defs' Reply at 10:1–3, citing to *Rothery Storage.* The court finds this last contention troubling. If the provision is in fact intended to prevent free-riding—i.e. allowing Borders to dilute its name recognition in the on-line market, then the provision goes beyond the "narrow tailoring" defendant asserts. Under section 6.1 during the term of the agreement Borders could not even provide overstock books to another online marketer even if there were no mention online that these books came from Borders. The court has insufficient evidence on this issue to make a determination at this time. Therefore, Defendants' Motion for Summary Judgment on this issue is denied.

### II. *Claims Regarding an Alleged Conspiracy to Monopolize*

Count IV of the FAC alleges that defendants entered into a conspiracy to monopolize the market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The elements of this claim are:(1) a combination, conspiracy, or agreement; (2) specific intent to monopolize; and (3) an overt act to further the conspiracy. *Paladin Assoc., Inc. v. Montana Power Co.,* 328 F.3d 1145, 1155 (9th Cir.2003), citing *United States v. Yellow Cab Co.,* 332 U.S. 218, 224–25, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

The existence of an agreement is not in dispute. As noted above, proof of a conspiracy requires proof of a specific intent to monopolize. Plaintiff's sole evidence of intent is his alleged "proof of an underlying violation of Section 1 of the Sherman Act." Pl. Motion at 13:20–22. Because the court has rejected plaintiff's arguments re-

---

**9.** Amazon.com has not provided the court with the actual study results.

garding *per se* violations and has not conclusively determined any Section 1 violation, plaintiff has not, at this stage of the proceedings, proven intent. Therefore, plaintiff's motion for judgment on the pleadings on this cause of action is denied.

### III. *Alleged Clayton Act Violations*

■ Each party argues that the court should rule in its favor on Count V of the FAC—the Clayton Act Claim. Count V of the FAC alleges that defendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18. ("Section 7"). *See* FAC ¶¶ 79–82. The language of Section 7 makes it unlawful for a firm to "acquire" the equities or assets of another firm where the necessary anti-competitive effects occur but it says nothing about liability for the seller. As a result, "a [S]ection 7 claim for monetary damages, as a matter of law, does not exist against the person or entity selling the assets but rather must be brought against the acquiring person or entity." *Arbitron Co. v. Tropicana Prod. Sales,* 1993 WL 138965, at \*4 (S.D.N.Y. Apr.28, 1993); *see also United States v. Coca–Cola Bottling Co.,* 575 F.2d 222, 230 (9th Cir.1978) (stating that sellers in Section 7 cases are not technically violators of the law); *Fricke–Parks Press, Inc. v. Fang,* 149 F.Supp.2d 1175, 1185 (N.D.Cal. 2001) (stating that Section 7 does not cover claims against sellers for damages); *Tim W. Koerner & Assocs., Inc. v.Aspen Labs., Inc.,* 492 F.Supp. 294, 300 (S.D.Tex.1980), *aff'd,* 683 F.2d 416 (5th Cir.1982) (holding that "by its express terms, [S]ection 7 of the Clayton Act is directed only against the acquiring corporation."). As a result, there can be no claim as a matter of law against Borders as there is no indication that Borders acquired an asset pursuant to the Agreement. The court will however, review the claim as it stands against defendant Amazon.com.

■ Section 7 of the Clayton Act is the principal antitrust statute applicable to mergers and acquisitions. It provides in relevant part as follows:

> No person engaged in commerce or in any activity affecting commerce shall *acquire,* directly or indirectly, the whole or any part of the *stock or other share capital* and no person subject to the jurisdiction of the Federal Trade Commission shall *acquire the whole or any part of the assets of another person* engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18 (emphasis added). For those subject to the jurisdiction of the Federal Trade Commission, the following transactions are within the reach of the statute: (1) both of the participants—the acquiring firm and the acquired firm—must be engaged either in interstate or foreign commerce or an activity affecting such commerce; (2) the challenged transaction must constitute an "acquisition" within the meaning of Section 7; (3) the acquisition must be of "stock" or "assets"; (4) the acquisition may be indirect as well as direct; and (5) the acquisition may be of all or any part of the stock or assets of the acquired person. 2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation,* § 29.02[1][c] (2d ed.2003).

### A. *The Acquisition Issue*

■ Previously, defendants brought a Motion to Dismiss, claiming that plaintiff had failed to allege any facts or allegations that the Agreement constituted a merger or its functional equivalent within the purview of Section 7 and alleging that the Agreement between Amazon.com and Bor-

ders constitutes an "acquisition" of "asset(s)" within the meaning of Section 7.

The words "acquire" and "acquisition" are not defined in Section 7 or elsewhere in the Clayton Act. In keeping with the broad mandate of antitrust laws, however, courts have generally adopted a flexible approach in determining the scope of this language. *Addamax Corp. v. Open Software Found., Inc.,* 888 F.Supp. 274, 285 (D.Mass.1995) (citing *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 337–339, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)); *see also United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 181–82 (S.D.N.Y.1960) (holding that the words "acquire" and "assets" are generic terms, which are to be given liberal interpretation by the courts).

The term "asset," as used in Section 7, has been broadly interpreted. It has been construed to include, among other things, patents, *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1205 (2d Cir.1981), *cert denied,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); trademarks, *United States v. Beatrice Foods Co.,* 344 F.Supp. 104, 114 (D.Minn.1972), *aff'd on other grounds,* 493 F.2d 1259 (8th Cir.1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975); and even sales routes and sales volumes, *United States v. ITT–Continental Baking Co.,* 485 F.2d 16, 20 (10th Cir. 1973), *rev'd on other grounds,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975).

At the April 7, 2002 hearing on defendants' Motion to Dismiss, this court ruled that plaintiff's allegations on the Section 7 claim were sufficient to put defendants on notice as to the nature of his claims. *See* Katriel Decl., Exh. A (April 7, 2003 Hearing Transcript at 22:9–23:5). The court did not, however, preclude defendants from raising this argument again as part of a motion for summary judgment. Defendants have, in fact, now made a claim for summary judgment on the Section 7 claim, and plaintiff has moved for judgment on the pleadings on this claim as well.

Plaintiff makes two arguments as to how the Agreement constitutes an "acquisition of assets" within the meaning of Section 7. First, plaintiff argues that in defendants' answer to the FAC, defendants "concede that, pursuant to their transaction, Borders granted Amazon.com the legal right to redirect users of the *www.Borders.com* website to Amazon.com's *www.Amazon.com* website." Pl. Mot. At 17:10–14 citing to Defendants' Answers at ¶ 35. Plaintiff then asserts that this legal permission is equivalent to the grant of a license from Borders to Amazon.com for the use of Border's website and thus falls into the definition of an acquisition as set out in *United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 181–82 (S.D.N.Y.1960)(Section 7 imposes no specific method of acquisition, rather with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges to give the transfer economic significance and a proscribed adverse effect.).

Many courts, including this one, have deferred to the ruling in *Columbia Pictures,* 189 F.Supp. 153, as guidance for the interpretation of Section 7. *See Nelson v. Pacific Southwest Airlines,* 399 F.Supp. 1025, 1028 (S.D.Cal.1975); *see also ITT Continental Baking,* 485 F.2d at 20; *Mr. Frank, Inc. v. Waste Mgmt., Inc.,* 591 F.Supp. 859, 866 (N.D.Ill.1984); *Southern Concrete Co. v. United States Steel Corp.,* 394 F.Supp. 362, 374 (N.D.Ga.1975), *aff'd,* 535 F.2d 313, *reh'g denied,* 540 F.2d 1085 (5th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977).

In *Columbia Pictures,* 189 F.Supp. at 181–82, Screen Gems, Inc., a wholly owned subsidiary of Columbia, was granted the exclusive right to distribute for fourteen years approximately 600 feature films

owned by Universal Pictures Company, Inc. The court held that such an agreement constituted an acquisition in light of Section 7:

As used here, the words 'acquire' and 'assets' are not terms of art or technical legal language. In the context of this statute, they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring person may accomplish the acquisition by means of purchase, assignment, lease, license or otherwise ...

*Id.* at 182.

Courts have held that there may be an "acquisition" within the scope of Section 7 in cases of a lease or license. *See United States v. Archer–Daniels Midland Co.,* 584 F.Supp. 1134 (S.D.Iowa 1984) (operating lease); *Columbia Pictures,* 189 F.Supp. 153 (long term exclusive license). In fact, one court has held that the obtaining of a local delivery route in the apparent absence of consideration was an "acquisition" under Section 7. *United States v. ITT Continental Baking Co.,* 485 F.2d 16, 20 (10th Cir.1973), *rev'd on other grounds,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975).

Plaintiff argues that Section 9.1 of the Agreement offers an independent basis for finding an "acquisition." Section 9.1 provides that:

As between the Parties: (a) Amazon.com reserves all right, title and interest in and to the Amazon.com Site, the Mirror Site (excluding all Borders.com Intellectual Property), and the Amazon.com Intellectual Property, together with all Intellectual Property Rights associated therewith and *no title or ownership of any of the forgoing is transferred, or, except as expressly set forth in Section 9.2, licensed to Borders.com,* or any other Person pursuant to this Agreement.

Ex. A to Kolbe Decl. At p.14, § 9.1 (emphasis added).

Plaintiff asserts that Section 9.1 reallocates ownership of the Borders.com website from Borders to Amazon.com. In *Columbia Pictures,* 189 F.Supp. at 183, the court stated that "asset" should be construed to mean anything of value. In the case at bar, there is no question that www.borders.com has value. As compensation for the arrangement, Borders obtains a percentage of the transaction revenues generated from the purchase of products through the site. *Id.* § 7.2. Accordingly, the website is an "asset" pursuant to the Clayton Act.

Defendants contend that the no acquisition has taken place and that the Agreement is merely a straightforward contract in which Amazon agrees to independently design, host, operate and maintain a new website accessible through the www.borders.com URL. The court need not determine this issue as plaintiff cannot in any event demonstrate the necessary anticompetitive effect.

### B. *The Issue of Anticompetitive Effect*

Assuming *arguendo* that the Agreement constituted a merger or acquisition, defendant claims that the Agreement poses no violation of Section 7 because plaintiff cannot prove that the Agreement may "substantially ...lessen competition, or ...tend to create a monopoly." 15 U.S.C. § 18. Plaintiff argues that the standard for showing an anticompetitive effect is quite minimal. "Section 7 is an incipiency statute that prohibits transactions even before any anticompetitive harm occurs." Pl. Mot. At 18:12–15. Still, plaintiff must show that the "merger create[s] an appreciable danger of [anticompetitive] consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable is called for." *California v. Sutter Health Sys.,* 130 F.Supp.2d 1109,

1118 (N.D.Cal.2001), *quoting Hospital Corp. of America v. Federal Trade Comm'n*, 807 F.2d 1381, 1389 (7th Cir. 1986). Evidence of a "mere possibility" of prohibited restraint or tendency toward monopoly is insufficient. *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

In order to determine whether there is anticompetitive activity as a threshold matter plaintiff must define the relevant market. The parties do not agree on the relevant market. Plaintiff urges that the market is online sales, defendants look to industry-wide sales. While defendants argue for a wider market definition they assert that even applying plaintiff's proposed definition of online book sales, Borders.com represented a *de minimis* share of the market, about 1% of all book sales through online sales channels. *See* Kessel Decl. at ¶ 14. As a matter of law, "foreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition.'" *Brown Shoe Co. v. United States*, 370 U.S. 294, 329, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Plaintiff counters that the defendants have only given gross total estimates as part of the declaration of Steven Kessel and thus the court cannot rule on this issue as part of a motion for summary judgment since it asserts defendants' sales figures are based on "inadmissible hearsay." Pl. Opp. at 17:13–19, citing Fed. R.Civ.P. 56(e)(summary judgment affidavit cannot recite hearsay"). Plaintiff, correctly anticipating that on reply defendants would bolster their evidence argues that plaintiff is entitled to cross-examine defendants on their evidence and to take discovery on this point. Plaintiff therefore requests a continuance under Rule 56(f). *See* Katriel Decl. at ¶ 3. While the court suspects that ultimately discovery will in fact show that Border's share of the market was *de minimis*, it concurs with plaintiff that summary judgment is not appropriately granted based on unsubstantiated "estimates," especially at this early stage of the proceedings. Thus the court grants plaintiff's request for a continuance on this claim so that the parties may engage in discovery. The court will forbear ruling on defendants' motion for summary judgment at this point.

The court is not persuaded, however that plaintiff has adduced any more reliable evidence on this claim in its motion for judgment on the pleadings. Plaintiff asserts that he may show "merely that the size of the entities involved 'makes them suspect in light of Congress' design to prevent undue [economic] concentration.'" Pl. Mot. For Judgment on the Pleadings at 19:1–7, quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 492 (5th Cir.1984). The "evidence" plaintiff relies on to demonstrate that the Agreement is suspect is Amazon.com's public statement that it is the "Earth's Biggest Bookstore" and "the leading online retailer of books" and that Borders is the largest operator of mall-based bookstores. Leaving aside for the moment the fact that plaintiff is switching relevant market definitions mid-stream (online books vs. all books sales), these alleged admissions in no way constitute evidence on which this court would grant a motion for judgment on the pleadings.

Moreover, plaintiff's claim that Borders.com was becoming a force to be reckoned with based on its revenue growth rate insults the court's intelligence. Firstly the revenue growth rate declined dramatically from 289 percent in 1999 to 53.1 percent in 2000, at the same time that Borders.com's losses increased. Since Borders.com sold such a small relative number of books online, a large internal percentage increase does not correlate

with a large increase in market share for online book sales.

## IV. *Liability under State Law Claims*

Liability on the state law claims is derivative of the federal antitrust claims. Plaintiff alleges that defendants were unjustly enriched at the expense of plaintiff and members of the class who made purchases from defendants during the class period by entering into the Agreement and by engaging in anti-competitive practices. FAC ¶ 90. Plaintiff further contends that given such unlawful conduct, plaintiff is entitled to the disgorgement by defendants of their ill-gotten gains. FAC ¶¶ 92–93. Defendants argue that there is no state law liability because there is no federal liability. Although the court has not made a final determination on the federal law claims, an independent basis exists for dismissing the unjust enrichment claim.

Plaintiff cannot assert an express contract between him and one of the defendants in order to establish standing, while also bringing a claim for unjust enrichment. A plaintiff may recover for unjust enrichment only where there is no contractual relationship between the parties.

■ Under California law, unjust enrichment is an action in quasi-contract. *Paracor Fin. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1167 (9th Cir.1996). An action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties. *Id.* (citing *Wal–Noon Corp. v. Hill,* 45 Cal.App.3d 605, 613, 119 Cal.Rptr. 646 (1975)); *see also Lance Camper Mfg. Corp. v. Republic Indem. Co.,* 44 Cal. App.4th 194, 203, 51 Cal.Rptr.2d 622 (1996).

■ Plaintiff's unjust enrichment claim expressly incorporates by reference the allegation that plaintiff "purchased books directly from at least one of the [d]efendants." FAC ¶ 10. Plaintiff is claiming restitution for overpayments made by himself and class members in their purchases of books from Amazon or Borders, which resulted from defendants' alleged unlawful practices. These damages result from the direct purchase which, under the California Commercial Code, creates an express contract between the buyer and seller. *See* Cal. Com.Code §§ 2106(1) & 2204(1). Accordingly, a valid express contract covering the same subject matter exists between the parties, and therefore an action in quasi-contract is inappropriate.

It should be noted that plaintiff contends that he should nevertheless be permitted to plead unjust enrichment in the alternative. Such an alternative claim might be stated if in count eight plaintiff alleged that no express agreement existed between plaintiff and either defendant. Instead, plaintiff has pleaded the opposite and relies on that contract as the basis for standing in the case at bar. *See* FAC ¶ 10. Even though Rule 8(e)(2) of the Federal Rules of Civil Procedure allows a party to state multiple, even inconsistent claims, it does not alter a substantive right between the parties and accordingly does not allow a plaintiff invoking state law to an unjust enrichment claim while also alleging an express contract. *See, e.g., New Paradigm Software Corp. v. New Era Networks, Inc.,* 107 F.Supp.2d 325, 329 (S.D.N.Y.2000); *Allied Vision Group, Inc. v. RLI Professional Techs., Inc.,* 916 F.Supp. 778, 782 (N.D.Ill.1996); *Klusty v. Taco Bell Corp.,* 909 F.Supp. 516, 521 (S.D.Ohio 1995). As a result, plaintiff cannot assert his unjust enrichment claim in the alternative.

Because plaintiff cannot allege in good faith, while maintaining his other claims, that no contract exists between himself and either Amazon or Borders, this court dismisses plaintiff's unjust enrichment claim without leave to amend. *See, e.g.,*

*Samuels v. Old Kent Bank,* 1997 WL 458434, at \*15 (N.D.Ill. Aug.1, 1997).

### CONCLUSION

As set out in detail above, the court finds that § 4.3 does not constitute *per se* price-fixing. The court further finds that § 4.3 is an ancillary provision, however, currently the record is not sufficiently developed for the court to determine whether the Agreement has an anti-competitive effect. Nor does the court have sufficient evidence before it to rule on defendants' motion for summary judgment on the issue of whether the Agreement constitutes an impermissible horizontal market allocation.

Plaintiff's motion for judgment on the pleadings on claims of an alleged conspiracy to monopolize the market is DENIED as plaintiff has not, at this stage of the proceedings, proven intent. The court also DENIES plaintiff's motion for judgment on the pleadings on the alleged Clayton Act violations, as plaintiff has not demonstrated on the record before the court sufficient anti-competitive effect. The court also DISMISSES Plaintiff's state law unjust enrichment claim.

The issue of whether plaintiff has standing by reason of having suffered sufficient antitrust injury is not clear from the record. Therefore the parties are requested to address this issue. Plaintiff shall file within twenty-one (21) days of the date of this order a brief not to exceed 15 pages addressing the issue of antitrust injury. Twenty-one (21) days thereafter defendants shall respond also in a brief not to exceed 15 pages. There will be no reply briefs. The court will then set a further hearing on this matter.

Depending upon the court's resolution of the antitrust injury issue or if after the hearing the court is still not able to deter-mine this issue conclusively, the court may ask the parties to conduct a damage study.

IT IS SO ORDERED.